2025 IL App (1st) 150978-U

FIRST DIVISION
April 21, 2025

No. 1-15-0978

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 11 CR 12410 (03) |
| CARDELL TAYLOR, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Geary W. Kull, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

*Held*: Trial court's dismissal of defendant's *Krankel* claim was proper where the court conducted a full *Krankel* hearing and there was no manifest error in its determination that his trial counsel was not ineffective. Moreover, we affirm defendant's conviction for first degree murder with additional findings that he committed the crime pursuant to contract, agreement or understanding and that he personally discharged a firearm that proximately caused the death of the victim where he knowingly and intelligently waived his *Miranda* rights and the cited prosecutorial comments did not, individually or cumulatively, cause him substantial prejudice or deprive him of a fair trial. Finally, we correct defendant's mittimus upon the State's concession according to the one-act, one-crime rule, as detailed herein.

¶ 1    Defendant-appellant Cardell Taylor (defendant) was convicted on multiple counts of first

degree murder, with additional findings that he committed the crime pursuant to contract, agreement or understanding and that he personally discharged a firearm that proximately caused the death of the victim. He was sentenced to 4 concurrent terms of 70 years in prison. Defendant initiated his direct appeal in 2015, and this Court has retained jurisdiction since that time. Following two limited remands, we finally reach and address in this decision all of defendant's raised contentions. Ultimately, we affirm, with a correction to the mittimus.

¶ 2                                BACKGROUND

¶ 3                           I. Procedural History

¶ 4      In 2015, defendant appealed his convictions, asserting four issues for review: his motion to suppress his statements to police should have been denied; the State committed prosecutorial misconduct; the trial court failed to conduct an inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), upon defense counsel's *sua sponte* assertion that she had provided ineffective assistance to defendant at trial; and, in the alternative of a new trial, his mittimus required correction. Finding error with respect to the *Krankel* issue, and without addressing the others, we remanded the cause with directions that it was for the limited and sole purpose of the trial court to conduct a *Krankel* inquiry. See *People v. Taylor*, 2018 IL App (1st) 150978-U, *modified upon denial of reh'g*, June 27, 2018 (modified to retain jurisdiction over appeal).

¶ 5      Upon remand, the trial court conducted a preliminary *Krankel* inquiry. It concluded there had been no ineffectiveness and, thus, denied defendant's request for the appointment of *Krankel* counsel. In 2020, defendant appealed from that ruling, asserting that the court had erred in its recollection of the evidence it used to make its determination. Agreeing with defendant, we again issued a limited reversal and remand of the matter, this time directing the trial court to

appoint *Krankel* counsel and conduct a full *Krankel* hearing. See *People v. Taylor*, 2020 IL App (1st) 150978-U (retaining jurisdiction over appeal).

¶ 6 Upon our second remand, the trial court conducted a full *Krankel* hearing as directed, during which defendant was represented by *Krankel* counsel and various witnesses testified. Following that hearing, the court denied defendant's request for a new trial, finding that his trial counsel's performance had not been deficient nor had he been prejudiced by counsel's actions and, thus, there had been no ineffectiveness.

¶ 7 Defendant has now appealed the trial court's finding of no ineffectiveness following the full *Krankel* hearing and its dismissal of his *Krankel* claim and request for a new trial. As we will describe herein, defendant's *Krankel* claim focused on the testimony of Bryan Johnson, an eyewitness who testified at codefendants' trials, but not his. In this appeal, defendant contends the court erred in dismissing his *Krankel* claim because his trial counsel was ineffective for not securing a written agreement where, as he alleges, an oral agreement had been made between his counsel and an assistant state's attorney (ASA) for Johnson's direct testimony to be admitted at his trial. He further contends his trial counsel was ineffective for not agreeing to admit Johnson's testimony in its entirety or for not requesting a continuance when it became clear that Johnson's direct testimony would not be admitted on its own. Defendant asks that we reverse his conviction and remand for a new trial. However, for the reasons discussed herein, we affirm the trial court's dismissal of defendant's *Krankel* claim as we find, based on the record before us, there was no manifest error in its determination that trial counsel was not ineffective.

¶ 8 Upon our affirmance of the *Krankel* issue, however, our review of this matter is not concluded. This is because defendant's remaining three contentions, namely, the denial of his

3

motion to suppress, his assertion of prosecutorial misconduct, and his alternative request for the correction of his mittimus, have not yet been addressed by this Court. As those issues were fully briefed at the time defendant filed his appeal, we must address them now. For the reasons discussed herein, we likewise find no error in the trial court's holdings with respect to the first two substantive issues. However, upon review of defendant's alternative sentencing issue, and upon the State's concession, we must correct his mittimus pursuant to the one-act, one-crime doctrine to vacate his less serious offenses.

¶ 9     For these reasons, in addition to affirming the dismissal of defendant's *Krankel* claim, we affirm defendant's conviction for the most serious offense of first degree murder with the added factors that he committed it pursuant to a contract, agreement or understanding and that he personally discharged a firearm that proximately caused the victim's death. In addition, we otherwise affirm his sentence with the correction to his mittimus that his convictions on the lesser remaining counts are, accordingly, vacated.

¶ 10                                    II. Factual Background

¶ 11    Because the details of the underlying crime have been mentioned in our multiple decisions surrounding defendant's appeal, albeit in the context of *Krankel* (see *Taylor*, 2018 IL App (1st) 150978-U, *modified upon denial of reh'g*, June 27, 2018; *Taylor*, 2020 IL App (1st) 150978-U) and in our decisions in the various appeals of codefendants Devin Bickham, Sr. and Devin Bickham, Jr. (see *People v. Bickham, Sr.*, 2017 IL App (1st) 142895, *modified upon denial of reh'g*, July 19, 2017; *People v. Bickham, Sr.*, 2020 IL App (1st) 182054-U; *People v. Bickham, Jr.*, 2017 IL App (1st) 142894-U; *People v. Bickham, Jr.*, 2020 IL App (1st) 181883-U), we set forth in detail only those facts necessary to our disposition of the issues raised in this

appeal.

¶ 12                                    A. Underlying Crime

¶ 13    In July 2011, Chervon Alexander,[1] who was pregnant, was murdered in the parking lot of Dominican Priory Park in River Forest, Illinois. She was shot once in the face and three times in the shoulder/arm while sitting in the front passenger seat of codefendant Bickham, Sr.'s parked car. Codefendant Bickham, Sr., a former police officer, was the victim's fiancé; however, he was married to another woman at the time. The prosecution was led by a team ASAs, including Adam McKay. Its overarching theory of the crime was that codefendant Bickham, Sr. had asked his son, codefendant Bickham, Jr., to contract with defendant (codefendant Bickham, Jr.'s friend and whom he referred to as his cousin[2]) to murder the victim in exchange for $400, and that the three carried out the agreement via a formulated plan, with codefendant Bickham, Jr. and defendant arriving at the park at a time specified by codefendant Bickham, Sr. after he and the victim were already there. Codefendants Bickham, Sr. and Bickham, Jr. were tried in simultaneous but severed jury trials, which were held separately from, and before, defendant's trial. Codefendant Bickham, Sr. was convicted of first degree murder with the additional factors that he committed it with a firearm and in a cold, calculated and premeditated manner (see *Bickham, Sr.*, 2020 IL App (1st) 182054-U), and codefendant Bickham, Jr. was convicted of first degree murder with the additional factors that he committed it with a firearm and did so pursuant

---

[1] Throughout the years, in defendant's and codefendants' legal proceedings, the victim's first name has been mistakenly spelled "Chevron." We wish to clarify that the proper spelling of her name is, indeed, Chervon. Additionally, we refer herein to Chervon by her first name when necessary for clarification.

[2] It is unclear from the record whether, in addition to their friendship, there was a bloodline relationship between codefendants and defendant.

to contract, agreement or understanding (see *Bickham, Jr.*, 2017 IL App (1st) 142894-U).

¶ 14    Defendant was represented by a team of assistant public defenders, among them counsels Susan Smith and Ruth McBeth.  The defense's theory of the case was that defendant did not participate in any plan nor did he shoot the victim; rather, he never left the car he was in when the murder occurred and the shooter was, instead, codefendant Bickham, Sr., with codefendant Bickham, Jr. retrieving the gun from him at the park and driving it away.

¶ 15                              B. Relevant Pretrial Proceedings

¶ 16                              *i. Motion to Suppress*

¶ 17    Prior to trial, defendant filed a multitude of motions, among them, a motion to suppress statements he made to police.  Therein, he asserted that he had been unable to make a knowing, intelligent or voluntary waiver of his *Miranda* rights due to "severe cognitive deficiencies," namely, that he was under the influence of intoxicating substances and he was "in an unstable mental and emotional state" when questioned by police.

¶ 18    At the pretrial hearing on this motion, River Forest Police Detective Seth DeYoung testified that defendant was arrested on July 11, 2011, at about 10:45 p.m., shortly after the murder.  The next morning, at approximately 8:20 a.m., Detective DeYoung, along with Detective Chris Pavini, spoke to defendant, who was unhandcuffed, in an interview room for about 50 minutes.  To begin, Detective DeYoung presented defendant with a preprinted form with his *Miranda* rights and asked him if he could read and write.  Defendant acknowledged he could read and began reading out loud the rights as written on the form.  After he read through the rights to himself, Detective DeYoung twice asked him if he understood them and defendant said he did.  Detective DeYoung then read defendant his *Miranda* rights and again asked him if

6

he understood them. Defendant responded, "Man," and signed the form. Next, Detective DeYoung interviewed defendant about the murder, and defendant provided various details as to time and place, and identified those involved and their relationships. Defendant admitted he killed the victim in exchange for $400. He identified and signed photographs of the gun used and of codefendants. When presented with codefendant Bickham, Sr.'s photo, he initially refused to look at or sign it, telling Detective DeYoung, "I can't sign that" and "He could take my family out, though."

¶ 19    Detective DeYoung stated that defendant never indicated he did not understand his rights or what was going on, and he did not ask for an attorney. Defendant was awake and alert during the entire interview and did not appear to be under the influence of drugs when speaking. Defendant, who had been in jail before for unrelated charges, asked questions of the detectives, including whether the victim was dead and whether he would go to prison. Detective DeYoung also confirmed that defendant was searched, and that his search, as well as his time spent in the room where he was held, had been videoed; Detective DeYoung watched defendant's search via video as it was taking place and did not see officers recover any drugs on defendant's person. At the conclusion of the interview, defendant wrote and signed a statement about the crime.

¶ 20    On cross-examination, Detective DeYoung averred that at one point during the interview, he asked defendant if he was "feeling okay" and why his voice sounded so gravelly, and defendant told him that was just how his voice sounds all the time. Defendant also mentioned that he had taken drugs the night of the murder, including Vicodin and Oxycontin, and that he was fearful of codefendants. Detective DeYoung noted that when he asked defendant to write and sign a statement on the photograph of the gun, he wrote, "This is the gun J.D. gave me," and

he needed some assistance in spelling "gun" and "gave."

¶ 21    After the parties and the trial court agreed to break so that the court could view defendant's videoed statement, the proceedings continued with forensic psychology expert Dr. Joan Leska's testimony on defendant's behalf.  Dr. Leska had interviewed his mother and his girlfriend, who told her defendant had a substance abuse problem until about a year ago.  Upon her interview with defendant, he told her that, on the day of the crime, he had smoked marijuana all day, had drunk a pint of whiskey late in the afternoon, and took a Vicodin tablet around 7 p.m.  He also told her that he took one Oxycontin tablet shortly before he was stopped by police and another around 8 a.m. before his police interview, which he had brought with him into the police holding room; he believed he was "still high" at the time of the interview.  Dr. Leska performed psychological testing on defendant, including a *Miranda* evaluation, which attempts to determine whether a defendant can provide a knowing, intelligent and voluntary waiver of his rights, and a *Miranda* comprehension test, which looks to a defendant's understanding of his rights.  With respect to the evaluation, defendant scored low on the various tests, with an overall full scale score placing him in the borderline-to-low average range of intellectual functioning.  With respect to the comprehension test, his overall score was 24 out of 30.  Dr. Leska found, along with his borderline intellectual function and the stress of the interview, this score indicated his ability to attend to, focus and process information would be significantly affected.  Dr. Leska also discussed with defendant his interview with police and watched the video.  Defendant reported to her that he had been anxious, fearful, and concerned about retaliation from codefendants during the interview.  In viewing the video, she opined that he seemed emotionally overwhelmed and confused and displayed slow mental activity, since he mumbled at times, made

comments about his life being over, and exhibited signs of distraction an inattentiveness, such as sometimes speaking in broken sentences and making "paranoid kinds of comments." Dr. Leska noted that when she interviewed defendant later, he was alert, his speech was clear, he was forthcoming, he spoke in full sentences and he showed no difficulty in his thought process or in answering questions appropriately. While she admitted that the video and reports demonstrated he had some ability to knowingly, intelligently, and voluntarily waive his *Miranda* rights, as he did "adequately well" on the *Miranda* assessment, she believed he did not adequately read the *Miranda* rights. She admitted there was no evidence of any police coercion, either "psychologically or physically," and the length of the interview was "relatively brief." It was her overall opinion that defendant's ability to make decisions and process information in order to knowingly and intelligently waive his rights were "seriously impacted" when he spoke to police.

¶ 22    On cross-examination, Dr. Leska acknowledged defendant had been arrested in the past. He had no history of mental illness, psychiatric problems, or any treatment for these. She also stated that, as part of her interview of defendant, she had provided him with a written consent form to read and he was able to do so out loud completely and with fair pronunciation. Additionally, he was able to identify all the pertinent elements of the form, and he signed and dated it. Dr. Leska affirmed that defendant knew and was aware of the seriousness of what was happening during the police interview.

¶ 23    Following argument, the trial court denied defendant's motion. The court stated that it had conducted a review of the "totality of the circumstances," including the claims of defendant's drug use and low intellect. As to the former, the court noted that Detective DeYoung testified he watched the search of defendant and that no drugs were recovered on his

9

person, while Dr. Leska relied on defendant's statement to her that he had taken drugs in the interview room right before the interview. It also noted her testimony that defendant's mother and girlfriend both told Dr. Leska that defendant's drug use had stopped a year ago. The court further found that in its view of the video, and seeing "his body language" and "reaction to things while he was talking to the police officers," which included a period where he took a break and was alone, "it did not appear that [defendant] was under the influence of any type of drug." For example, the court observed that defendant was not "passing out" and officers did not have to "continue to try to get his attention to get him to answer questions."

¶ 24     As to defendant's mental and emotional state, the court indicated there "is no doubt that anyone" who is arrested and interrogated for murder would be stressed and fearful and would respond that they were not "okay" when asked. The court pointed out, however, that defendant was not exhibiting this stress and fear at the beginning of the interview but, rather, only after continued questioning, as the facts of the crime unfolded and when he raised questions to police about how much prison time he might receive. As to his intellect, the court recalled the testimony about defendant's misspellings and noted that people make similar mistakes, especially when stressed, so this was reasonable under the circumstances and not a clear indication of low intellect. Furthermore, it noted that even if defendant experienced reading issues, simply because someone does not read well does not mean they do not understand what is explained to them; defendant had the opportunity to read the *Miranda* form, and Detective DeYoung read it to him, as well. In addition, the court compared that *Miranda* form to the examination waiver Dr. Leska had given defendant to read, both of which were presented at the hearing. It found Dr. Leska's opinion that defendant could not understand the simple wording of

the *Miranda* form, but could understand the complexities of confidentiality, consent, and evaluation elements of her form to be "incongruous." The court averred it "had problems" with Dr. Leska's testimony and evaluations, as she had "based a lot of things on statements by [defendant] that were self-serving." Accordingly, upon its evaluation of all the circumstances, the court denied defendant's motion to suppress his statements to police, finding that he had knowingly, intelligently, and voluntarily waived his *Miranda* rights.

¶ 25                           *ii. Motion in Limine Regarding Dress Color*

¶ 26     In a separate pretrial motion *in limine*, defendant also sought to exclude from trial certain details of the victim's personal life, such as her education, pregnancy, etc. Relevant to this appeal, defendant specifically sought to exclude details that at the time of the murder, the victim was planning her wedding to codefendant Bickham, Sr., as well as details about the place, date, and bridesmaid dress colors she had selected for the wedding. At a hearing on this motion, in discussing this with the parties, the court expressed that the State should be "allowed to get into the fact that she's planning her wedding" as it reflected the motive for the murder and could properly be admitted via testimony from the victim's family members who participated in the planning. However, it believed details about "the place, date, and colors planned" were "not appropriate, not relevant." After further discussion, the court stated it would "certainly [be] allowing any testimony about her planning the wedding." It then clarified:

> "* * * I do find the whole planning the wedding to be relevant to [defendant's] case
> and so, again, I'm allowing testimony about her planning the wedding * * *. I don't
> think it's necessary to get into and will not allow the colors of the dresses and everything

11

else. * * * Is that clear enough or do I need to be more clear about it?

[THE STATE]: No, Judge, I understand that you are allowing that the victim and family members were planning a wedding; but regarding the specific details about the color of the dresses, you are not allowing. Would you allow the place and date of the wedding?

* * *

THE COURT: * * * I think that's relevant, I think that's admissible * * *."

¶ 27                    *iii. Discussion Regarding Witness Bryan Johnson--Pretrial*

¶ 28     During the ongoing pretrial hearings, in December 2014, one item raised by the trial court to defense counsels Smith and McBeth and ASA McKay was whether witness Bryan Johnson would testify in person. Johnson, an eyewitness in the park at the time of the murder, had testified at codefendants' trials. However, Johnson was scheduled to leave the country within a month for a lengthy study-abroad program. The court observed for the record that it seemed defendant did not object to Johnson's direct testimony from codefendants' trials being admitted into evidence at his trial and read by a court reporter, but it wished to clarify this. ASA McKay stated:

"That's fine, Judge. If we can avoid an evidence deposition of this young man, that's great. And we would call the court reporter to put in the direct.

If [defense] counsel needs -- or wants anything more, I need to know that now before this kid gets on a plane."

The court told defense counsels they had "time to think about it," but "[n]ot much time," and that if their "position changes and you want an evidence deposition, then you're going to have to do

so" soon. After ASA McKay suggested the State "would pay for a videotaped evidence deposition" that could be done at defense counsels' convenience sometime within the month, defense counsel Smith responded:

> "Judge, this isn't an issue right now. Can we please deal with the motions that are the issue?"

When the court warned defense counsels that this was "the only one that's left as an issue," as it had previously stated it would not be ruling on their remaining motions *in limine* at this time because they were numerous and it needed to read them, defense counsel McBeth referred the court to a hearsay motion and further discussion was had with respect to other items, but not Johnson. At the conclusion of the hearing, the court set an interim status date, specifically reminding defense counsels that this "gives you a couple weeks to think about" doing an evidence deposition of Johnson, but that they should not wait to decide until "the day before" he was to leave. No evidence deposition was ever taken of Johnson.

¶ 29    At a subsequent status hearing in January 2015, the trial court averred for the record that the parties had seemingly "resolved whether or not" Johnson's testimony was going to be admitted. The court noted that "there was no objection to the transcript being read" and that the parties had agreed it should be read by a court reporter, but it asked if they preferred it be read by the same court reporter who had taken his testimony at codefendants' trials or a different court reporter. ASA McKay said he preferred the former. When the court asked defense counsel Smith if she agreed, she responded, "It doesn't matter to me, that's fine." Johnson was not

discussed further during pretrial proceedings.

¶ 30                                 C. Defendant's Trial

¶ 31     Eventually, defendant's cause proceeded to a jury trial. Relevant to this appeal, Mary

Alexander, the victim's mother, testified that in the summer of 2011, she lived with Chervon, her

other children and Chervon's daughter.[3] Chervon was engaged to codefendant Bickham, Sr. and

a wedding date had been set for August 27, 2011, which would have been Chervon's deceased

father's birthday. Mary described that she and her daughter-in-law had been helping Chervon

plan the Montrose Beach wedding shortly before her murder. At this point, the State asked Mary

if she had "become aware of what color, if any, would be selected for the women's dresses?"

The defense objected, and the trial court sustained the objection.

¶ 32     The following evidence was then adduced from myriad witnesses. In 1999, codefendant

Bickham, Sr. married his wife and, as a gift for his wedding, received a handgun. On July 11,

2011, while still married, he spent the early evening with the victim—his pregnant fiancé—at her

mother's home, and then drove with her in his car, a Buick Century registered to him and his

wife, to the parking lot of Dominican Priory Park where they could be alone. While at the

victim's mother's house and during the drive to the park, codefendant Bickham, Sr., codefendant

Bickham, Jr. and defendant relayed and shared their whereabouts with each other several times

via cell phone texts and calls, including some 14 and 11 minutes before the murder. During this

time, codefendant Bickham, Jr. and defendant were driving in the nearby areas of Oak Park and

River Forest in a silver Chevrolet Impala, another car owned by and registered to codefendant

_____

[3] This child was from a previous relationship and is not the biological child of codefendant
Bickham, Sr.

Bickham, Sr.

¶ 33    Sometime later, police received a 911 call about a shooting at the park. When police arrived, they found the victim in the front passenger seat of codefendant Bickham, Sr.'s car, shot in the face and shoulder. Codefendant Bickham, Sr., who had not been shot or injured during the incident, gave a description of the assailant as a black male wearing a white shirt who fled the parking lot on foot and got into a gray vehicle that drove off travelling eastbound on Division Street. An officer in the area heard the transmitted description and soon thereafter saw a silver Chevrolet Impala traveling in the wrong lane. The officer observed the driver, who matched the description, and stopped the car. Codefendant Bickham, Jr. was driving and defendant was in the front passenger seat. Codefendant Bickham, Jr. was wearing khaki cargo shorts and a white T-shirt, and defendant was wearing black shorts and a white button-down shirt over a white T-shirt. Police recovered a handgun on the floorboard of the driver's seat, which was the same gun codefendant Bickham, Sr. had received as a wedding gift. At this point, codefendant Bickham, Jr. began explaining to officers that while he was driving with defendant from Oak Park to Chicago, they had gotten lost and, at Harlem Avenue and Division Street, a man threw the handgun into the car and onto his lap. Then, as both codefendant Bickham, Jr. and defendant were standing outside the Impala with police, defendant said to codefendant Bickham, Jr., "I want to get my money now."

¶ 34    Meanwhile, back at the crime scene, officers spoke with codefendant Bickham, Sr., as well as Stephanie Fumo and Bryan Johnson, who had been in the park together with friends at the time of the murder. Officers transported the three to the area where codefendant Bickham, Jr. and defendant had been stopped in the Impala for a show-up identification. Codefendant

Bickham, Sr. viewed the men and denied knowing either of them. After a short while, however, he admitted to police at the show-up location that he knew codefendant Bickham, Jr. and that he was his son. Additionally, officers discovered that the Impala was registered to codefendant Bickham, Sr.

¶ 35                                *i. Fumo's Trial Testimony*

¶ 36    Fumo testified at defendant's trial that she had noticed a man, later identified as codefendant Bickham, Sr., and a woman standing on the passenger side of a car in the lot of the park that evening. She was close enough to hear their voices but could not hear what they were saying to each other. Later, she saw a different man approach the front of the car and speak to the first man, who was outside the car; she could no longer see the woman. Soon thereafter, she heard popping noises from that direction and when she turned to look, she saw the second man leaving and going toward Division Street. Fumo testified that this man was black and wearing shorts and a "baggy white shirt," which she further described as "an open shirt, like flowy" and simulated for the record a shirt that is open down the middle. Fumo further testified that codefendant Bickham, Sr. was now on the side of the car, sitting on the curb. As Fumo approached him, he was crying and said his girlfriend had just been shot. Fumo called 911. She recounted that after police arrived and talked to her, they took her to another location for a show-up identification. She saw two men who wore clothing similar to the man who ran from the park, but she could not recognize their faces.

¶ 37    On cross-examination, Fumo repeated that the white shirt the man who ran from the park was wearing was "really flowy." She averred that she did not remember, however, whether or when she had given police this part of the description. Defense counsel Smith asked Fumo if the

16

man was wearing "light-colored shorts," but Fumo stated she could not remember. After Smith presented Fumo with her written statement to police two days after the murder, Fumo acknowledged that in her statement she had told police the man wore "lighter-colored shorts," but that as she was testifying now, she could not "specifically remember" what color the shorts were. Smith then called Fumo's attention to two trial exhibits, which were the clothing recovered from defendant's and codefendant Bickham, Jr.'s persons on the night of the murder. With these exhibits, Smith elicited testimony from Fumo wherein Fumo agreed that the shorts recovered from defendant were "black" and "not lighter-colored," and the shorts recovered from codefendant Bickham, Jr. were "lighter-colored" and would be the kind of shorts she would refer to when she would use the term "lighter-colored." Smith further asked Fumo if she had viewed a lineup at the police station. Fumo acknowledged she had and admitted she had been unable to identify anyone.

¶ 38    On redirect examination, the State played a police dashcam video for Fumo taken at the show-up, depicting the two men, defendant and codefendant Bickham, Jr., as she viewed them on the night of the murder. The following exchange took place:

> "[STATE:] Which one are you describing looks similar clothing wise to the person, the third person you described at Priory Park?
>
> [FUMO:] That one.
>
> [STATE:] The one –
>
> MS. SMITH: May the record reflect that she indicated the person on the right who is

wearing the white T-shirt and light-colored cargo pants, shorts.

[STATE]: Now you see both individuals, is that correct?

[FUMO:] Yes.

[STATE:] Which one looked like the one running away?

[FUMO:] The one in the light shorts I believe.

[STATE]: I am sorry.

MS. SMITH: The one in the light shorts.

[STATE]: All right. Ms. Fumo, you can have a seat. State tenders the witness * * *."

¶ 39                    *ii.. Physical Evidence and Defendant's Confession*

¶ 40    In terms of physical evidence presented at defendant's trial, a forensic analysis of cell phones belonging to codefendants and defendant revealed a multitude of communications among the three on the day and evening of the murder. Specifically, text messages and call logs that had been attempted to be deleted from the phones were recovered, and they showed that codefendants contacted each other, and defendant and codefendant Bickham, Jr. contacted each other, several times that evening about their respective locations.

¶ 41    In addition, photographs of the crime scene revealed that the victim's body, which was in the front passenger seat of the Buick Century, was slumped over the center console and the front passenger window had been shattered. Four fired shell casings and four fired bullets were recovered from the crime scene, matching the gun recovered from the Impala. Four unfired rounds were also recovered from the scene.

¶ 42    The autopsy of the victim showed the gunshot wound to her head had stippling around her face. Of the three wounds to her shoulder and arm, two were nearly adjacent to each other,

indicating the shots came in quick succession and there was little movement between the shooter and the victim between the shots. The other wound had an atypical opening and no stippling, indicating that this shot hit and broke the car window before hitting the victim.

¶ 43    With respect to the gun recovered from the Impala, forensic analysis revealed that it contained a mixture of at least three DNA profiles; defendant and codefendant Bickham, Sr. could not be excluded, and the probability of their DNA was one in six. Codefendant Bickham, Jr. was conclusively excluded.

¶ 44    Further, gunshot residue (GSR) testing which was performed on all three men's persons and clothing revealed the following. Codefendant Bickham, Sr. tested positive for GSR on his left hand, indicating he had discharged a firearm, was in the vicinity of a discharged firearm, or made contact with an item with primer gunshot residue on it. Defendant tested positive for GSR in the center of his outer shirt, namely, the white button-down shirt he was wearing. Codefendant Bickham, Jr.'s GSR tests were negative.

¶ 45    Finally, the audio and video from defendant's confession to police, which he gave the morning after the crime, was presented and admitted into evidence via the testimony of Detective Pavini, who had accompanied Detective DeYoung during defendant's interview. Briefly, and consistent with Detective DeYoung's pretrial testimony at the motion to suppress, defendant confessed to being the shooter, admitted he committed the murder in exchange for $400 from codefendants, and identified, signed, and dated photographs of codefendants and the handgun recovered from the Impala.

¶ 46    On cross-examination, Detective Pavini was questioned about some details in defendant's confession. For example, Detective Pavini noted that when asked if the passenger window of the

19

Buick Century was up or down at the time of the shooting, defendant first said it was down, and then said it was up; however, on redirect, Detective Pavini described that defendant corrected himself "immediately" about this detail and neither he nor Detective DeYoung corrected him. Additionally, although defendant at first did not mention that the gun jammed or malfunctioned and only confirmed this after he was asked by Detective DeYoung, he demonstrated for the officers of his own accord how it jammed and how he cleared the jam by hitting the gun. And, while defendant mentioned he had taken Vicodin and Oxycontin, detective Pavini stated he did not appear to be under the influence of any drugs at the time of the interview and he understood defendant clearly, including when defendant asked if the victim was dead or on life support and how much prison time he would get. Detective Pavini further corroborated Detective DeYoung's pretrial testimony that, when asked to identify codefendant Bickham, Sr.'s photograph, defendant at first refused, saying, "I can't sign that," followed by, "He could take my family out, though," but he eventually identified, signed, and dated the photograph.

¶ 47    Defense counsel began Detective Pavini's recross-examination questioning him about a

preliminary GSR test given to defendant.  The following exchange took place:

"[DEFENSE COUNSEL] Q.  And as far as gunshot residue goes, there was a preliminary gunshot residue test given to [defendant] at the scene; is that right?

[DETECTIVE PAVINI] A.  Yes.

Q.  By an evidence technician; right?

A.  Yes.

Q.  And that was negative; right?

[ASA 1]:  Oh, objection.

[ASA 2]:  Objection.

[DEFENSE COUNSEL]:  I'm sorry.  If I --

[ASA 3]:  Unbelievable.

[ASA 1]:  We should correct the record now, Judge.

[DEFENSE COUNSEL]:  Whoa, whoa.  Excuse me.

[ASA 1]:  I want to approach.

THE COURT:  Relax.

[ASA 1]:  That is a misstatement.

THE COURT:  All right. I sustained the objection.

[DEFENSE COUNSEL]:  Judge, it is a mistake.  Then I will take it back.  We have all made mistakes.

[ASA 1]:  Judge --

THE COURT:  The objection is sustained.  It's a misstatement.  That didn't happen.  You can go ahead.

[DEFENSE COUNSEL]: Let me cure it, please.

[ASA 1]: Thank you. Thank you.

[DEFENSE COUNSEL]:

Q. You knew about a gunshot residue test being given preliminarily; is that right?

[DETECTIVE PAVINI] A. I believe so, yes.

* * *

Q. To [defendant,] right?

A. Yes.

Q. Did you know the results of that?

A. No."

¶ 48    *iii. Discussion Regarding Witness Bryan Johnson--During Trial*

¶ 49    As the trial continued, and near the close of the State's case-in-chief, the trial court had a discussion with the parties outside the presence of the jury regarding Johnson's testimony, as the parties, now revisiting this issue, disputed what should be admitted at defendant's trial. The State indicated it would be willing to enter into its case-in-chief the transcript of Johnson's testimony from codefendants' previous trials but would not stipulate to only portions of it; that is, it would not admit his direct testimony without the cross-examination as well. ASA McKay stated that "the agreement in my mind was that we could put testimony in through the court reporter, not [just] a part of the testimony." Defense counsel, meanwhile, asserted that the parties had previously agreed the defense would not seek an evidence deposition and, in exchange, the parties would stipulate to and enter only Johnson's direct testimony, since cross-examination had been conducted by other attorneys for codefendants who may have had

22

competing interests. After some lengthy debate with both sides contrarily describing what they

believed the previous agreement was, the trial court ultimately stated it did not believe it could

properly admit Johnson's cross-examination from the previous trials. It instructed the parties:

> "So you guys decide if you want to go deal with the bargain. But as far as I'm
>
> concerned, the only thing that can go in is the direct, if it goes in at all. And that's only
>
> by way of agreement because it is otherwise hearsay."

Ultimately, the parties did not come to an agreement. The court had them express their views on

the record, with the State repeating its belief that there was an agreement for the "entire

testimony coming through the court reporter" and with defense counsel indicating that "the

agreement was that we would stipulate to direct testimony only." The trial court concluded that,

regardless of whatever was discussed before, "you don't agree" and "there is no agreement

now." Accordingly, the court deemed Johnson's testimony hearsay and inadmissible.

¶ 50                    *iv. Conclusion of Trial, Sentencing, and Posttrial Motion*

¶ 51    After all the witness testimony and physical evidence was published to the jury, the State

rested. Defendant moved for a directed finding of acquittal, which the trial court denied. The

defense then rested and the cause moved to closing arguments, which were extensive on the part

of both parties. The State reiterated its theory of the case that defendant and codefendants

planned the victim's murder together and that defendant shot the victim at the park in exchange

for $400. Defendant reiterated his theory of the case that codefendant Bickham, Sr. was the

shooter, codefendant Bickham, Jr. was responsible for taking the gun away from the park, and he

was set up as the "fall guy" and "patsy." The State followed with a rebuttal closing argument,

during which defense counsel lodged several objections. The trial court overruled some and

sustained others; it also instructed the jury that argument was not evidence.

¶ 52    At the close of argument, the court sent the jury to deliberate.  Defense counsel moved for a mistrial, arguing that, while many of the objections it made during the State's rebuttal closing argument were sustained, the State's remarks "cumulatively and individually" were in error.  The court acknowledged the State "knows better than" to make some of the comments it did; however, it reiterated that it had sustained many of the objections raised by defense counsel and "d[id]n't really believe they amount to a motion for a mistrial."  Thus, it denied the motion.

¶ 53    The jury found defendant guilty of first-degree murder, with the additional findings that he committed it pursuant to contract, agreement or understanding and that he personally discharged a firearm proximately causing the victim's death.  Defendant was sentenced to 70 years' imprisonment on Counts 1 and 2, with Count 1 merging into Count 2; 70 years on Counts 7 and 8, with Count 7 merging into Count 8; 70 years on Counts 10 and 11, with Count 10 merging into Count 11; and 70 years on Counts 16 and 17, with Count 16 merging into Count 17, each sentence to run concurrently.

¶ 54    Defense counsel filed a posttrial motion for a new trial, which was later amended. Relevant here, counsel raised error on the part of the trial court for denying defendant's pretrial motion to suppress statements and claimed prosecutorial misconduct.  In addition, defense counsel Smith alleged her own ineffectiveness under *Krankel* for failing to secure a written agreement with the State providing that neither side could "back out of the [oral] stipulation to put into evidence the direct examination" of Johnson.  The trial court denied the motion.

¶ 55                    III.  Appellate Procedural History and *Krankel* Claim

¶ 56    Defendant appealed, raising issues with respect to (1) the denial of his motion to

suppress; (2) prosecutorial misconduct; (3) the trial court's failure to conduct a *Krankel* inquiry upon defense counsel's *sua sponte* assertion of ineffectiveness; and (4) alternatively, the correction of his mittimus. Without addressing the other claims, this Court found error with respect to the *Krankel* issue. We held that, although it was counsel, and not defendant, who raised her own ineffectiveness, the trial court nonetheless had a duty to make adequate inquiry into the claim.[4] Therefore, we remanded the cause with directions that it was for the limited and sole purpose of the trial court to conduct a *Krankel* inquiry. See *Taylor*, 2018 IL App (1st) 150978-U, ¶¶ 36-37, *modified upon denial of reh'g*, June 27, 2018 (retaining jurisdiction over the appeal).

¶ 57    Upon remand, the trial court conducted a preliminary *Krankel* inquiry. It denied defendant's motion once again and ended the *Krankel* inquiry at this stage. Defendant appealed, claiming that the court committed reversible error by ruling on the merits of his claim instead of appointing counsel and did so without proper recollection of the record. Finding that the court's denial of defendant's request for the appointment of *Krankel* counsel was manifestly erroneous because it relied on extraneous and incorrect recollection of the evidence presented at trial, we reversed and remanded the matter again, this time for the court to conduct a full *Krankel* hearing, including the appointment of *Krankel* counsel to litigate defendant's ineffective assistance claim. See *Taylor*, 2020 IL App (1st) 150978-U, ¶¶ 65-66 (retaining jurisdiction over the appeal).

¶ 58                                IV.  *Krankel* Hearing

¶ 59    Upon our second remand, the trial court appointed *Krankel* counsel to defendant and held a full hearing in early 2021. *Krankel* counsel called Johnson, defense counsel Smith, and ASA

---

[4] Our decision preceded *People v. Bates*, 2019 IL 124143.

McKay.

¶ 60    Johnson testified that on the night of the murder, he was in the park with friends, including Fumo.  From where he was, he could hear voices of people talking in the parking lot.  The voices stopped for a while and then he heard several sequentially-rapid popping noises from that same direction.  When he and Fumo walked toward them, he saw a man near the edge of the lot start running toward the street.  Although he could not see the man's face, he described him as black, athletic build, medium height, and wearing a "[w]hite shirt and cargo shorts [which] looked tannish, khaki color;" he could not tell if the shorts had pockets.  Johnson further testified that he and Fumo approached a car in the lot, whereupon he heard crying or moaning noises and saw a different man who told them his girlfriend had been shot.  Johnson averred that officers arrived and drove him to a nearby location for a show-up identification.  He viewed two men who looked "[r]oughly like what [he] had seen in the parking lot, white shirt and shorts;" he could not tell police whether the facial features of either man matched the person he saw running away.  *Krankel* counsel then asked Johnson whether one of the men matched the clothing description of what he had seen.  Johnson responded "Yes, yeah," and that he "believe[d]" he told that to officers, but he "couldn't say for sure if it was the person" because he had not seen the face of the man who fled.

¶ 61    On cross-examination, Johnson was asked if, at the time he gave the description of the man's clothing, he was confident about the style and color of the shorts.  Johnson admitted he was confident as to the style, but "less confident in the exact color."  Additionally, Johnson was asked to review his prior testimony at codefendants' trials about his description of the man's shirt.  During that prior testimony, Johnson had been asked whether one of the men at the show-

26

up had the same body type as the man he saw running away. Johnson had replied in the affirmative. He was then asked if that man who had that same body-type was wearing "the same shirt, the white like button-down shirt or white non T-shirt that [Johnson] saw running," and he had again answered in the affirmative. Johnson confirmed that had been his testimony, and that is how he recalled the events now, as well.

¶ 62    On redirect examination, *Krankel* counsel asked Johnson if he recalled whether the person with the white, flowy button-down shirt had light or dark colored shorts on. He testified that he could not remember. He further stated that when using the word "khaki," while he would not mean it in the sense of a dark color today, he "might have used the word khaki differently back then."

¶ 63    *Krankel* counsel next called defense counsel Smith. At the outset of her testimony, Smith, who had been with the Cook County Public Defender's Office for many years prior to working on this case, stated her notes on defendant's case "are lost" and, upon questioning, she could not recall much of what happened at that time. For example, when asked about the importance of Johnson's testimony, she testified that she did not recall reviewing the transcript from codefendants' trials and could not say for sure whether she, or any of her cocounsels, had planned to call Johnson to testify at defendant's trial. She later remembered that she had thought his testimony regarding the clothing description would be important, but she could not remember if it was because it strengthened Fumo's description or because it was different. She then stated she remembered she had wanted Johnson to testify or to use his testimony from codefendants' trials, and she had wanted the stipulation as to Johnson's description of the clothing of the man who ran because it was different than what defendant was wearing that night. She insisted that

27

she remembered she would not have gone ahead with the trial "if [Johnson] wasn't available in some form," such as his personal presence or a stipulation.

¶ 64    When questioned about what she remembered regarding Johnson's availability, Smith recalled being informed he was going to be out of the country, but she could not remember when she learned this and she did not recollect any conversation regarding him being unavailable for trial. Specifically, she had "no recollection" of the December 2014 pretrial hearing wherein the trial court discussed with the parties the option of having Johnson's evidence deposition taken and its warning about his unavailability, nor could she recall the State's offers to stipulate to his direct testimony in its case-in-chief or to make him available for an evidence deposition. When asked if she remembered any stipulations regarding Johnson, Smith averred she remembered talking to ASA McKay, but she could not remember when that was, who was present, or exactly where said conversation happened. Moreover, she did not remember discussing with ASA McKay exactly what the stipulation would be. Rather, she testified that she believed she was "just stipulating to his direct testimony during" codefendants' trials. She admitted nothing was put in writing regarding a stipulation about Johnson, and she could not remember if there were any written stipulations in the trial, at all. She further admitted she could not recall speaking to anyone else about the stipulation, nor whether the parties made it on record, nor whether it appeared anywhere in the record. At this point, the State and *Krankel* counsel "stipulated that there is no conversation on the [trial] record about a stipulation of Bryan Johnson."

¶ 65    Smith further testified that, at some point after trial began, she learned from a conversation with ASA McKay that the State was not going to stipulate to Johnson's testimony. She could not recall exactly when that happened other than it was sometime after defense

28

counsel's opening, wherein the defense presented its theory of the case that codefendant Bickham, Sr. was the shooter, codefendant Bickham, Jr. was the man running away with the gun, and defendant "was a patsy" who never left the Impala. When asked if she recalled a conversation about whether there would be a stipulation to just Johnson's direct examination or his entire testimony from codefendants' trial, Smith stated:

"We wanted the direct, just the direct. And that was – before the trial started that was the agreement between me and Mr. McKay.

[*Krankel* COUNSEL:] Q. Okay. And do you recall if then this agreement that you were told was no longer an agreement, if it was based on direct examination versus the entire testimony of Mr. Johnson, or was there not going to be a stipulation to any part of the testimony of Mr. Johnson?

A. I can't remember which it was. I know that the initial agreement was to introduce the testimony that was taken during direct. I don't remember if the, if the withdrawal from that agreement was from any stipulation at all or just stipulating to the whole thing versus half of it."

¶ 66    Smith acknowledged she did not want to stipulate to Johnson's cross-examination from codefendants' trials because "there was a different, slightly different clothing description that was alluded to during his cross-examination" which "referred to the kind of shirt that the person who ran" was wearing; she admitted that description, which was "of the shirt as being a white, button-down, flowy shirt," was "at odds" with the defense's theory of the case. She confirmed that Johnson's cross-examination testimony was consistent with Fumo's testimony. She also confirmed that the dashcam video showed defendant and codefendant Bickham at the show-up,

and showed defendant wearing a white, button-down shirt over another shirt, and that the button-down shirt was "unbuttoned." Smith relayed that generally, it "wasn't [her] practice at the time" to put stipulations in writing. Here, she did not do so because she had the transcript of Johnson's testimony and she believed this was sufficient at the time.

¶ 67    Lastly, ASA McKay testified at the *Krankel* hearing. He stated he recalled a pretrial conversation with Smith wherein he offered to make Johnson available to her for an evidence deposition or alternatively to stipulate to his testimony from codefendants' trials. ASA McKay noted that the result of this conversation was that "there was no agreement for either the evidence dep or the entire testimony of [Johnson];" Smith never took his deposition and there was never an agreement about a stipulation. ASA McKay could not recall if, at the outset of trial, he intended to call Johnson as a witness. However, once the defense presented its opening argument and revealed its theory of the case was that the shooter was codefendant Bickham, Sr., he "felt there was no need" to call Johnson. As he explained, this was because Johnson's testimony, with the clothing identification, focused on the man who ran from scene, whereas codefendant Bickham, Sr. had remained at the car where the victim was killed. ASA McKay further testified that, had defense counsel wanted to stipulate to Johnson's entire testimony, cross and direct, he would have agreed, but he "would not have stipulated to just the direct examination." He noted that if, hypothetically, there had been an agreement between him and Smith about admitting Johnson's direct testimony only, he "would have stuck with that agreement," but it was his position that the agreement was always intended to "be both direct and the cross in lieu of an evidence deposition that never took place."

¶ 68    After hearing this testimony and reviewing all the transcripts provided by the parties, the

trial court found that defense counsel Smith had not been ineffective for failing to preserve, or alternatively offer, Johnson's testimony at defendant's trial. In a lengthy and thorough colloquy that began by pointing out the "fluid" nature of trials which requires attorneys to constantly exercise and revise their decision-making, the court noted there were many aspects to consider in an ineffective assistance claim. First, it touched on the attorneys themselves and made clear for the record that, at the time of defendant's trial, Smith was an experienced criminal defense attorney for over two decades and was part of the public defender's murder task force, while McKay was a top prosecutor in the ASA's office with equal experience in murder trials. Then, the court examined the contents of Johnson's testimony, from codefendants' trials and from the *Krankel* hearing, and concluded it was "a wash as to identification." As it pointed out, Johnson testified on direct that the man running away wore khaki cargo shorts and on cross that he wore a white button-down shirt, specifying it was not a T-shirt. When pulled over by police shortly after the shooting, codefendant Bickham, Jr. was wearing khaki cargo shorts and a white T-shirt, and defendant was wearing darker-colored shorts and a white button-down shirt. To the court, this rendered Johnson's testimony a "two-edge sword" for defendant, as the description of the shorts would have benefitted him but the description of the shirt would have been detrimental.

¶ 69      Noting that it was obvious Smith would have liked only Johnson's direct testimony to be admitted, the court next examined the discussions counsels had on record during the trial proceedings and their testimony at the *Krankel* hearing regarding a potential agreement and its content. The court recalled that when asked if she had anticipated calling Johnson, who had always been listed as a State's witness, to testify as a witness for defendant, Smith responded that she could not remember if she had ever planned to do so. Additionally, the court reviewed the

transcripts of the December 2014 and January 2015 pretrial hearings, which showed "brief interaction between the parties" about Johnson's direct testimony and hinted at a potential agreement, as well as an offer of an evidence deposition, which Smith and the defense team did not feel the need to discuss at that time. In the court's view, Smith "did not want both the direct and the cross examination of" Johnson, which was understandable in a strategic sense; yet, Smith wanted "the good part of his testimony and not the bad part of his testimony." To then later claim, as Smith did, that Johnson's testimony was essential to the defense was, the court believed, "exaggerated [and] misleading" since Johnson's testimony "adds or detracts very little" because "the positive and the negative balance each other out as to the khaki shorts versus the white shirt." The court stated that all this amounted to "the quintessential he said/she said in terms of whether or not there had been an agreement beforehand."

¶ 70    Finally, the court noted that, "regardless of whether there was an agreement," Smith still had the opportunity to enter the totality of Johnson's testimony at defendant's trial, and "she made a decision to decline to have that." Again, the court found this to be understandable in light of all the evidence and testimony presented, which included defendant being pulled over in the Impala owned by codefendant Bickham, Sr. with the murder weapon inside, his statement about wanting "to get my money now," him wearing the white button-down shirt, the GSR on that shirt, his videotaped confession to police which included his corroborating description that he had to clear the gun when it jammed, live rounds recovered from the scene consistent with that gun, and the text and phone records evidence. From all this, the court found Smith's performance was "in no way deficient" and her decisions with respect to Johnson's testimony "did not prejudice [defendant] in any way." Accordingly, it held that, as "there's no reasonable

probability that the results of [his] trial would be different had [Johnson] testified," there was "no ineffective assistance of counsel."

¶ 71                                    ANALYSIS

¶ 72    Due to our previous limited remands, we first address defendant's newest supplemental *Krankel* claim asserting error on the part of the trial court in finding no ineffectiveness. Because we affirm that decision and thereby finally resolve that matter, the three remaining issues raised by defendant on appeal must now also be addressed. We do so, in turn.

¶ 73                          I. Current *Krankel* Appeal

¶ 74    In our prior decision ordering a full *Krankel* hearing in this matter, we posed the question: would "the inclusion of Johnson's testimony * * * have made a difference in the outcome of defendant's jury trial and supported a finding that [Smith]'s failure to secure Johnson's testimony amounted to ineffective assistance of counsel so as to require reversal or remand of his conviction?" *Taylor*, 2020 IL App (1st) 150978-U, ¶ 60. In 2021, we answered that it was "not for us, at this time, to say." *Taylor*, 2020 IL App (1st) 150978-U, ¶ 60. That time has come, as we are now faced with this precise question. And, ultimately, based on the entirety of the record before us, we find that the answer is no.

¶ 75    Defendant contends on appeal[5] that the trial court's ruling was incorrect because Smith was ineffective for failing to secure a written agreement to stipulate to Johnson's direct testimony from codefendants' trial where the record shows there was an oral agreement to do so and Johnson's testimony would have supported the defense theory of the case, thus resulting in

---

[5] The parties filed supplemental briefs in 2024 in our Court as to the *Krankel* issue, following the trial court's decision finding no ineffective assistance of counsel.

severe prejudice. He alternatively contends Smith was ineffective for not agreeing to admit Johnson's testimony in its entirety or asking for a continuance when it became clear the State would not agree to admit only his direct testimony.

¶ 76 The standard of review in this context is clear. Where, as here, a trial court has conducted a full *Krankel* hearing and has reached a determination on the merits of the defendant's *Krankel* motion, we will reverse only if the court's action was manifestly erroneous. See *People v. Jackson*, 2020 IL 124112, ¶ 98; accord *People v. Hill*, 2023 IL App (1st) 150396, ¶ 29; *People v. McCall*, 2021 IL App (1st) 172105, ¶ 54. Manifest error occurs only when the trial court's ruling demonstrates error that is "clearly evident, plain, and indisputable." *Jackson*, 2020 IL 124112, ¶ 98; see also *People v. Reed*, 2020 IL 124940, ¶ 51; see *McCall*, 2021 IL App (1st) 172105, ¶ 54 (where it properly conducted *Krankel* hearing and reached determination on merits of *Krankel* motion, "our review of the trial court's ruling is limited to a determination of whether the court manifestly erred"). Ultimately, deference in this *Krankel* context lies with the trial court, as " '[t]he trial court, most familiar with the proceedings at issue, remains best suited to serve the interests of judicial economy by extinguishing conclusory claims.' " *People v. Little*, 2021 IL App (1st) 181984, ¶48 (quoting *People v. Roddis*, 2020 IL 124352, ¶ 56).

¶ 77 Obviously, *Krankel* claims necessarily center on an evaluation of whether trial counsel was ineffective. Such an evaluation requires the application of the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)). Under this test, the defendant must prove both that his counsel's performance was deficient, namely, that counsel's actions constituted errors so serious as to fall below an objective standard of reasonableness; and

that counsel's deficient performance was prejudicial, namely, that absent the errors committed by counsel there was a reasonable probability the outcome of his trial would have been different. *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687). A reasonable probability is a probability sufficient to undermine confidence in the outcome. See *Strickland*, 466 U.S. at 694; accord *People v. Enis*, 194 Ill. 2d 361, 376 (2000) (trial counsel's deficient performance must have rendered the result of the trial unreliable or fundamentally unfair).

¶ 78 It is well established that there is a strong presumption that the challenged action of counsel is not a product of incompetence and, instead, falls " 'within the "wide range of reasonable professional assistance." ' " *People v. Steidl*, 142 Ill. 2d 204, 240, 248 (1991) (quoting *People v. Franklin*, 135 Ill. 2d 78, 116-17 (1990), quoting *Strickland*, 466 U.S. 668). Significantly, simple errors of judgment or mistakes in trial strategy do not make defense counsel's representation ineffective. See *People v. West*, 187 Ill. 2d 418, 432 (1999). In fact, trial tactics encompass matters of professional judgment and we will not order a new trial for ineffective assistance based on these claims. See *People v. Reid*, 179 Ill. 2d 297, 310 (1997). Specifically, decisions regarding witness testimony and evidence to be presented at trial are matters of trial strategy and lie solely with defense counsel, except if counsel's "strategy" was so unsound that she failed to meaningfully test the case against the defendant. See *West*, 187 Ill. 2d at 432; accord *People v. Ward*, 187 Ill. 2d 249, 261-62 (1999). Ultimately, in evaluating counsel's effectiveness, we look at the totality of counsel's representation. See *People v. Eddmonds*, 101 Ill. 2d 44, 69 (1984).

¶ 79 In the instant cause, based upon our thorough review of the record before us, we find that the situation at hand does not amount to ineffective assistance, as there was neither deficient

performance on the part of Smith nor any prejudice affecting defendant so as to render the trial court's denial of his *Krankel* claim manifestly erroneous.

¶ 80 The crux of defendant's argument centers on his insistence that there was an oral agreement between defense counsel Smith and ASA McKay that only Johnson's direct testimony from codefendants' trials would be admitted at his trial. Defendant claims that Smith's failure to memorialize this agreement in writing proved her deficient performance, as it allowed McKay to "outmaneuver" her by later refusing to honor that agreement and instead demand both Johnson's direct and cross be admitted. He further claims this, in turn, prejudiced him because the outcome of his trial would have been different had Johnson's direct testimony been presented, as it would have proved he never left the Impala that evening. We disagree.

¶ 81 To begin, we cannot say Smith was deficient for not securing a written agreement to stipulate to Johnson's direct testimony. This is because our reading of the record, most particularly of the two pretrial hearings detailed above and Smith and McKay's testimony at the *Krankel* hearing, does not clearly demonstrate there was an oral agreement between them specifying that only Johnson's direct testimony from codefendants' trials would be admitted. And, if there was no oral agreement, then we cannot find Smith deficient for failing to memorialize one.

¶ 82 First, and foremost, there is no official, or written, agreement in the record establishing that the parties agreed only Johnson's direct testimony would be admitted. We have scoured the record and have found none, and during the *Krankel* hearing, the State and *Krankel* counsel both admitted and "stipulated that there is no conversation on the [trial] record about a stipulation of

Bryan Johnson."

¶ 83    This leads us to consider whether, as defendant insists, there was some sort of oral agreement between defense counsel and the State.  Yet, as we are tied wholly to the record for our review, we cannot say such a specific agreement was made—it is not in the record. Moreover, there are only two points in the record discussing Johnson and his testimony.  One is at the pretrial hearings of December 2014 and January 2015.  As we have described, in the first of these, Smith and her cocounsel McBeth, along with ASA McKay, were discussing motions *in limine* when the trial court questioned the parties about whether Johnson was going to testify in person.  The court indicated that it thought Johnson's direct testimony was going to be admitted and read by a court reporter, but it wanted to clarify this.  ASA McKay commented that he was "fine" if this was the chosen option, but he also offered for Johnson to sit for an evidence deposition, at defense counsels' convenience and at the State's expense.  The court then warned defense counsels that Johnson would be leaving soon so this needed to be resolved.  Smith stated this was not an issue right now and McBeth referred the court to other motions *in limine* the defense wanted to discuss.  At the close of the hearing, the court set a status date and told defense counsel it was giving them "a couple weeks to think about" how they wanted to proceed with Johnson's testimony.

¶ 84    At the next hearing in January 2015, the only mention of Johnson's testimony is just that: a reference to Johnson's testimony, not specifically to only his direct.  In this portion of the record, the court noted it seemed the parties had "resolved whether or not" Johnson's testimony was going to be admitted and that "there was no objection to the transcript being read."  The question the trial court had was whether the parties wanted the same court reporter who recorded

that transcript from codefendants' trials to read it, or if they wanted it read by a different court reporter. ASA McKay said he preferred the same reporter, while Smith responded that was "fine" since she had no inclination either way.

¶ 85     Neither of these hearings indicates that there was truly an oral agreement between Smith and McKay that only Johnson's direct testimony would be admitted. While the transcript of the December 2014 hearing tentatively hints at the prospect, the potential for an evidence deposition is then presented and discussed as an alternative option, with the court ending the hearing by setting a new status date and specifically telling defense counsel it was giving them time to think about how to they wanted to proceed. Had the parties already orally agreed that only Johnson's direct would come in, as defendant now insists, there would have been no need for this. To the contrary, this seems to indicate that no oral agreement had been reached, which further explains why Smith and McBeth were more interested in discussing motions *in limine* with the court rather than Johnson's testimony. Moreover, the January 2015 hearing further muddies the waters for defendant's claim, as what is mentioned is not specifically Johnson's direct testimony but, rather, his testimony in general terms. At this hearing, the court refers to Johnson only very briefly. It notes there seems to be no objection from the parties to "*the transcript* being read" at defendant's trial, and questions the parties as to the manner in which it will be presented, *i.e.*, via the court reporter who took it or a different one. (Emphasis added.) Taken in its entire context, which is minimal at best, it remains unclear exactly what was meant by "transcript." The court did not specify that what would be read into defendant's trial would be only Johnson's direct testimony from codefendants' trials. The court could have just as easily been referring to Johnson's entire testimony (his direct and cross). Additionally, the court could also have been

38

referring to a transcript of an evidence deposition, as was discussed at the prior hearing. The only thing that was made clear was that this "transcript," were it to be presented at trial, would be read by the same court reporter who transcribed it. Without more, it cannot be said on this record that the parties had an oral agreement to admit only Johnson's direct testimony from codefendants' trials.

¶ 86    The only other point in the record that sheds light on whether there may have been an oral agreement is the testimony elicited at the *Krankel* hearing from Smith and McKay. Yet, that does not support defendant's claim, as their testimonies are directly at odds with each other. On one hand, Smith's testimony regarding whether an oral agreement existed was both vague and, at times, contradictory. At the outset, she could not remember why Johnson's testimony was important to the case, or whether she or any of her cocounsels had planned to call Johnson or had even reviewed the transcript of his testimony from codefendants' trials. She recalled that she knew Johnson would be unavailable for defendant's trial, but she could not recall the pretrial hearings when the court discussed this with her nor the option it afforded her to take an evidence deposition. She also admitted that while she remembered speaking to ASA McKay about Johnson, she could not remember anything specific about a stipulation. Yet, later in her testimony, Smith averred she believed they had agreed that only Johnson's direct would be admitted and that she did not want the cross to come in because, while Johnson's direct stated the man running away wore light colored shorts (like codefendant Bickham, Jr.) thereby exculpating defendant, his cross stated the man was also wearing a white button-down shirt (like defendant) thereby implicating defendant. Ultimately, however, she testified that when the supposed agreement fell apart, she could not remember if it had been based on Johnson's direct testimony

39

or his entire testimony.

¶ 87    In contrast, ASA McKay's testimony at the *Krankel* hearing was clear and unrebutted. He testified that he remembered a pretrial conversation with Smith wherein they would stipulate to Johnson's testimony or, alternatively, wherein he would make Johnson available for her to take his evidence deposition before he left the country.  He confirmed that after the pretrial discussions, there was, in the end, no agreement regarding Johnson, as he and Smith never agreed to any stipulation and Smith never took him up on his offer for an evidence deposition. As he further explained, once the defense revealed its theory of the case and argued that the shooter was codefendant Bickham, Sr., he felt there was no need for him to call Johnson because Johnson's testimony focused on the man who ran away, not the shooter.  ASA McKay made clear he always believed whatever agreement they had with respect to Johnson was that, if his testimony would be presented, it would include both his direct and cross in lieu of his evidence deposition, which was never taken.

¶ 88    When presented with this, the trial court found that the situation boiled down to "the quintessential he said/she said in terms of whether or not there had been an agreement beforehand" and, thus, there was no basis to find that Smith's failure to obtain a written stipulation amounted to deficient performance.  Based on the inconclusiveness of the record on this point, we cannot find manifest error in this holding.  Essentially, it seems Smith thought she had an oral agreement with McKay that only Johnson's direct would be admitted; yet, she could provide no real details supportive of that.  McKay, meanwhile, insisted nothing was ever really agreed to, and if there was any agreement, it would have been for both the direct and cross.  Yet, admittedly, like with Smith, there is nothing specific in the record that completely verifies his

belief, either.[6]  Short of, in essence, suggesting one of these attorneys is not being truthful, which we will not do, all we can say is that, ultimately, it appears Smith and McKay simply never had a full meeting of the minds regarding Johnson and what portions of his testimony from codefendants' trials, if any, would be presented at defendant's trial.  In turn, and without being able to confirm there was an oral agreement, we cannot say, as defendant would have us, that Smith's lack of reduction of it to a written stipulation amounted to deficient performance as his trial counsel.  After all, she cannot be deemed deficient for doing something that would otherwise be impossible, namely, getting an oral agreement in writing that never existed in the first place.

¶ 89    Even if there was an alleged oral agreement between Smith and ASA McKay that only Johnson's direct testimony from codefendants' trials would be admitted at defendant's trial (which we are unsure existed), Smith's failure to memorialize it in writing would still not amount to deficient performance warranting the reversal and remand of defendant's conviction.  As established earlier herein, we evaluate a counsel's representation in its totality when determining effectiveness (see *Eddmonds*, 101 Ill. 2d at 69), and we will not find ineffectiveness unless her actions (or inactions) were so unsound that she failed to meaningfully test the case against the defendant (See *West*, 187 Ill. 2d at 432; *Ward*, 187 Ill. 2d at 261-62).

¶ 90    Smith's failure to memorialize the oral agreement in writing (if it truly existed) would, at worst, equate to an error of judgment or a mistake in trial strategy—matters of professional judgment upon which an ineffectiveness claim cannot be based.  See *Reid*, 179 Ill. 2d at 310.

---

[6] It is noteworthy, however, that, as the trial court mentioned in its *Krankel* colloquy, Johnson had always been listed as witness for the State.

This is because, apart from this alleged failure, she vigorously represented defendant and challenged the cause against him zealously and relentlessly. The trial court stated as much in its colloquy upon the *Krankel* hearing and, as the record clearly supports this conclusion, we cannot find it was manifestly erroneous. We have thoroughly examined the record of defendant's trial. As lengthy as it is, it repeatedly demonstrates that Smith (and her team) strenuously argued for defendant from beginning to end: before trial during the many pretrial hearings and motions *in limine*; during trial by making argument, cross-examining a multitude of witnesses, and issuing objections, many of which were sustained; and after trial by presenting a detailed posttrial motion raising many issues of error. Moreover, it cannot be denied, as the court pointed out, that at the time of defendant's trial, Smith had already been an experienced criminal defense attorney for over two decades, held various high and supervisory positions, and was part of the public defender's murder task force. Smith also testified during the *Krankel* hearing that it simply "wasn't [her] practice at the time" to put stipulations in writing, and particularly in this case she did not think she needed to because she had the transcript of Johnson's testimony. Clearly then, at the time of this occurrence, Smith was not deviating from her general routine or her professional judgment. See, *e.g.*, *People v. Fuller*, 205 Ill. 2d 308, 331 (2002) (ineffective assistance claims are reviewed "not in hindsight, but from the time of counsel's conduct, and with great deference accorded to counsel's decisions").

¶ 91 Most significantly, Johnson's direct testimony would have been, at best, cumulative to defendant's cause and would not have done much to assist his defense. As he reiterated at the *Krankel* hearing, Johnson's direct testimony from codefendants' trials consisted of his admission that he could not identify the man he saw running away from the park that evening, as he did not

see his face.  He could only describe that the man was wearing "a white shirt and cargo shorts [which] looked tannish, khaki color."  His testimony further noted that, when he was presented with the two men at the show-up identification, he again could not identify either of them by face and stated to police only that one of them matched the clothing description; however, he never specified which.

¶ 92    Apart, and independent, from this, Smith had already elicited a plethora of evidence conveying exactly the same content and information Johnson's direct testimony would have provided.  The defense consistently asserted that the man running away from the park wearing khaki-colored cargo shorts was codefendant Bickham, Jr., whereas defendant, who was wearing black shorts, never left the Impala.  At trial, police video of the show-up identification, which took place shortly after the murder, was presented.  It showed the direct dichotomy of codefendant Bickham, Jr. wearing khaki-colored cargo shorts when pulled over by police, standing next to defendant who was wearing black shorts, which Smith pointed out to the jury at trial.  Further video evidence referred to the jury by Smith, this time of defendant while in custody at the police station, again showed him wearing black, not khaki, shorts.  Testimonial evidence about the difference in the color of shorts was also obtained from various police officers who took the stand.

¶ 93    In addition, perhaps the prime example of not only the cumulative nature of Johnson's direct testimony, but also of Smith's thorough representation of defendant, is what took place during Fumo's testimony at trial.  As noted, Fumo testified on direct that the man running away was wearing shorts, but she could not remember the color.  On cross-examination, Smith asked her if the shorts were "light-colored;" Fumo again stated she could not remember.  Smith then

43

confronted Fumo with her written statement to police taken two days after the murder, wherein Fumo specifically described the shorts of the man running away as "lighter-colored." To drive the point home further, Smith presented Fumo with two trial exhibits—the actual, physical shorts recovered from codefendant Bickham, Jr. and those recovered from defendant. Smith elicited direct admissions from Fumo that the shorts recovered by police from defendant soon after the murder were "black" and "not lighter-colored," the shorts recovered from codefendant Bickham, Jr. were "lighter-colored," and that this latter pair of shorts would be the kind of shorts she (Fumo) would refer to when using the term "lighter-colored." Smith further obtained Fumo's admission that she had been unable to identify anyone involved in the murder.

¶ 94    What is more, Smith's efforts to convey to the jury that defendant was not the man running from the park wearing the khaki-colored shorts did not end there. The record demonstrates that on Fumo's redirect examination, the State showed her (and the jury) video of the show-up identification featuring codefendant Bickham, Jr. and defendant, just as Fumo had seen them that night. The State asked Fumo which of the men in the video looked similar "clothing wise" to the man running away from the park. Fumo pointed, and Smith immediately jumped in stating: "May the record reflect that she indicated the person on the right who is wearing the white T-shirt and *light-colored cargo pants, shorts*," that is, codefendant Bickham, Jr. and not defendant. (Emphasis added.) The State attempted to have Fumo clarify by asking her if she could see both men in the video. Fumo affirmed that she could see them both, and this time in response, she verbally stated that "[t]he one in the light shorts I believe" was the man who ran away. Again, Smith immediately reinforced for the court, the jury, and the record that

Fumo was identifying "[t]he one in the light shorts."

¶ 95    It was not manifest error, then, for the trial court to conclude that Johnson's direct testimony essentially "adds or detracts very little" to defendant's cause. This is especially true in light of the other evidence elicited and presented by defense counsel Smith which went exactly to the purpose for which she sought that testimony's admission: to show that the man running from the park was identified as wearing khaki-colored cargo shorts, and when codefendant Bickham, Jr. and defendant were pulled over by police minutes after the murder, codefendant Bickham, Jr. was wearing khaki-colored cargo shorts while defendant, in contrast, was wearing black shorts. Accordingly, to say that Johnson's direct testimony was crucial to, or the linchpin of, the defense, as defendant would have us do now, is an overstatement. Rather, it was only cumulative of the evidence presented and would have added nothing new. Therefore, with that borne out, and with our thorough review of the record demonstrating that Smith quite competently represented defendant at his trial and meaningfully challenged the case against him, we cannot say she performed deficiently based on a failure to reduce an alleged oral agreement for cumulative testimony to writing. See *Eddmonds*, 101 Ill. 2d at 69; *West*, 187 Ill. 2d at 432, and *Ward*, 187 Ill. 2d at 261-62.

¶ 96    Even if it could somehow be said that Smith performed deficiently in this context (which she did not), defendant still could not demonstrate the second prong of *Strickland*, which requires him to also show that Smith's failure to obtain a written stipulation of the alleged oral agreement to admit Johnson's direct testimony prejudiced him. See, *e.g.*, *People v. Sanchez*, 169 Ill. 2d 472, 487 (1996). In this vein, defendant must demonstrate that, absent Smith's alleged failure and had Johnson's direct testimony been admitted, there was a reasonable probability that he

would not have been convicted. See, *e.g.*, *Domagala*, 2013 IL 113688, ¶ 36. In other words, he must be able to show that Smith's alleged failure rendered the result of his trial unreliable or fundamentally unfair. See, *e.g.*, *Enis*, 194 Ill. 2d at 376. Just as with the performance prong, in the context of a *Krankel* inquiry wherein a trial court has already reached a determination on the merits, our review proceeds under manifest error, with deference to the trial court's ultimate holding. See *Little*, 2021 IL App (1st) 181984, ¶ 48. In light of the overwhelming evidence presented against defendant, we do not find any manifest error in the court's determination that Smith's alleged failure did not prejudice defendant.

¶ 97    In analyzing prejudice, the trial court found that the evidence of defendant's guilt outweighed any exculpatory value Johnson's direct testimony may have provided him and, thus, the outcome of his trial would not have changed had it been presented. We wholly agree, as the physical and circumstantial evidence against defendant was overwhelming. Defendant was pulled over in the silver Impala near the park only minutes after the shooting. The Impala matched the description and direction of travel given to police by codefendant Bickham, Sr.; it was registered to codefendant Bickham, Sr., the pregnant murder victim's fiancé; and, it was being driven by his son, codefendant Bickham, Jr. The men were pulled from the Impala and the murder weapon was found inside; it was verified to be the same handgun codefendant Bickham, Sr. had received as a wedding gift years before. Then, after codefendant Bickham, Jr.'s excuse to police that an unidentified man threw the gun into the car as they were driving, and while waiting for the show-up identification to be conducted, defendant turned to Bickham, Jr. and said, "I want to get my money now."

¶ 98    In addition, cell phone evidence revealed that defendant and codefendants had been

communicating with each other throughout the day, into the evening, and even minutes before the murder took place, and it showed that attempts had been made to delete the call logs. Moreover, a mixture of at least three DNA profiles were found on the handgun. Defendant and codefendant Bickham, Sr., who by all accounts always remained at the car where the shooting occurred, could not be excluded from these profiles, and the probability that this was their DNA was one in six. Codefendant Bickham, Jr. was conclusively excluded from these profiles. Also, while codefendant Bickham, Jr.'s GSR testing was negative, codefendant Bickham, Sr.'s hand tested positive for GSR, as did, more critically here, the center of defendant's shirt—the outer, white button-down shirt he was wearing at the time he was pulled over in the Impala. Glaringly, Fumo testified, apart from her equivocal memory of the color of the shorts, that she was certain the man who ran from the murder scene was wearing a white button-down shirt: she described it as a "baggy white shirt," "an open shirt, like flowy," and "really flowy." Dashcam video of the show-up identification, as well as the video of defendant in custody at the police station, showed him wearing a white button-down shirt over a white T-shirt that evening.

¶ 99 Finally, there was audio and video evidence of defendant's confession to police. Therein, he identified codefendants and the handgun. He confessed to being the shooter, even describing for police how he had to unjam the gun at one point, which was consistent with both the live rounds recovered at the murder scene and the forensic analysis of the short distance between two of the victim's bullet wounds. He also admitted he committed the murder in exchange for $400, which was consistent with his statement to codefendant Bickham, Jr. immediately before the show-up identification about him wanting "to get my money now." In light of this overwhelming evidence against defendant, we fail to find any substantive merit to his claim that

47

he surely would have been acquitted had Smith obtained a written agreement to admit Johnson's direct testimony at his trial, which consisted only of his minimal identification that the man running from the park was wearing khaki-colored cargo shorts. And, as there simply is no reasonable probability the outcome would have been different, there can be no prejudice.

¶ 100    Accordingly, on this record, defendant has not demonstrated either prong of the *Strickland* test.  He cannot show that Smith performed deficiently in failing to secure a written stipulation as to an alleged oral agreement between her and ASA McKay which supposedly would have admitted Johnson's direct testimony from codefendants' trial at his trial where there is no solid proof that such an oral agreement existed; and, even if it did exist, he likewise cannot show that the failure to memorialize what amounted to nothing more than cumulative evidence somehow invalidated Smith's otherwise textbook representation of him.  Moreover, defendant cannot show he was prejudiced by the exclusion of Johnson's direct testimony as, again, it was merely cumulative and would not have altered the result of his trial in light of the overwhelming evidence against him.  Therefore, we do not find manifest error on the part of the trial court in concluding Smith was not ineffective.

¶ 101    Defendant asserts one last alleged mistake on the part of Smith that he insists amounted to ineffective assistance.  He claims that, once it became clear to Smith that Johnson's direct testimony would not be admitted at his trial without its accompanying cross-examination from codefendants' trials, she should have either agreed to its admission in its entirety or asked for a continuance to have Johnson testify in person.  Defendant insists these efforts would have aided his defense strategy since Johnson's cross was "not as damaging as [Smith] seemed to think" and any "downside of the cross-examination was outweighed by having another witness cast doubt"

on his guilt.  Employing the *Strickland* test in the context of *Krankel* one final time here, we find no manifest error in the trial court's ultimate decision refuting these claims.

¶ 102   First, with respect to the performance prong, defendant is asking us to find a deficiency in Smith's performance based on her decision not to agree to the admission of Johnson's entire testimony at trial when the agreement she believed she had for the admission of just his direct fell through.  However, defendant's argument goes precisely against the well-established principles that a claim of ineffective assistance of counsel is not to be reviewed with the aid of hindsight but, rather, from the time of counsel's conduct, and that the fact that another attorney might have pursued a different strategy or that the strategy chosen ultimately proved unsuccessful do not establish ineffectiveness of counsel.  See *Fuller*, 205 Ill. 2d at 331.

¶ 103   Additionally, defendant's argument is unreasonable.  Johnson's cross would have been incredibly damaging to defendant's case, as it both directly implicated him and directly contradicted the theory of the case Smith proposed to the jury.  That is, the defense theory was that codefendant Bickham, Sr. was the shooter, codefendant Bickham, Jr. was the man in the park who retrieved the gun from his father and ran away, and defendant was nothing more than a patsy who knew nothing of these events and sat in the Impala from the moment codefendant Bickham, Jr. picked him up until the moment police pulled them over.[7]  It is true that Johnson's direct testimony seemingly would have bolstered Fumo's in that Johnson identified the man who ran as wearing "tannish, khaki color" shorts.  However, his cross would not have.  As Smith

---

[7] At the full *Krankel* hearing, Smith verified that this was the defense's theory and this was the theory introduced at trial.  She explained that during the preliminary *Krankel* hearing which preceded the more complete one, she had mistakenly argued to the trial court that the defense theory at trial had been that codefendant Bickham, Jr. was the shooter.

testified during the *Krankel* hearing, she did not want Johnson's cross to be admitted at defendant's trial. She made clear that the reason for this was because it contained a "different clothing description" which was "at odds" with the theory the defense presented.

¶ 104 Interestingly, during the *Krankel* hearing, Johnson stated that, while he had been confident about the style of the shorts (*i.e.*, cargo) the man who ran away was wearing, he was "less confident in the exact color," and he "might have used the word khaki differently back then" during codefendants' trials when describing light versus dark colors as opposed to now.

¶ 105 Apart from this *Krankel* testimony, and what is more significant, is that Johnson's entire trial testimony would have also bolstered Fumo's testimony that the man who ran was also wearing a white button-down shirt. During his testimony at codefendants' trials, he confirmed that the man who ran was wearing a "white like button-down shirt or white non T-shirt." The evidence at trial showed codefendant Bickham, Jr. wearing a white T-shirt; yet, it also showed that defendant was wearing a white button-down shirt over a white T-shirt. Johnson's description about the shirt, then, was not only distinct, but much more specific than his testimony regarding the color of the shorts. Additionally, Fumo's testimony was already problematic for defendant in the same respect. However, as we noted in detail, Smith had been able to attack Fumo's testimony on cross-examination when, as mentioned, Fumo picked out codefendant Bickham, Jr. rather than defendant when viewing the video evidence in front of the jury. Smith would not have had the same opportunity to do this with Johnson, as Johnson was not present for trial. Clearly, Johnson's description of the color of the shorts might have benefitted defendant, but his description of the shirt, which would have remained uncontested by the defense if Smith had agreed to the admission of his whole testimony, would have been disastrous. We are hard-

pressed to find a more precise metaphor than that of the proverbial "two-edge sword" employed by the trial court when describing Johnson's complete testimony during the *Krankel* hearing and the effect its blades would have had on defendant's trial.

¶ 106    Nor can we find that Smith's failure to ask for a continuance to obtain Johnson's live testimony at trial was ineffective, as defendant would have us declare.  Another axiomatic principle regarding review of ineffective assistance of counsel claims is that counsel cannot be held ineffective for failing to file futile motions.  See *People v. Hartfield*, 2022 IL 126729, ¶ 38. Had Smith asked the trial court for a continuance in order to secure Johnson's in-person testimony, there is hardly any indication in this record that it would have been granted.  First, it is clear that Smith would not have even entertained this an option.  Her *Krankel* testimony is explicit that she did not want any of Johnson's testimony from his cross-examination at codefendants' trials to be admitted, as she only wanted testimony regarding the color of the shorts (Johnson's direct) and nothing about the white button-down shirt (Johnson's cross).  Next, Smith admitted she had the transcript of Johnson's testimony.  Had she wanted to, and had it fit the narrative of the defense's theory of the case, she could have stipulated to Johnson's whole testimony.  However, as a seasoned defense attorney, she admittedly knew it did not, and a continuance would not change that.  To agree to admit Johnson's complete testimony would have been counter to the defense strategy.  Furthermore, and as we have detailed, the trial court gave Smith and her defense team several opportunities to obtain Johnson's full testimony long before the late point in defendant's trial when the issue of Johnson's testimony was discussed. Two of these occurred before trial, in December 2014 and January 2015, when the court warned them that Johnson's testimony was a concern, that Johnson would soon be leaving the country,

that the State had offered to make him available at their cost and at the defense's convenience for an evidence deposition, and that they should not wait in making their decision. Later, the court also *sua sponte* allowed time during the trial itself for the defense to consult with the State to see if they could reach an on-record agreement regarding the admission of Johnson's testimony (they did not). After the trial court's warnings and opportunities, and with the State's case-in-chief coming to a close and Johnson still set to be abroad for several more months, it was reasonable for the defense to conclude a motion for a continuance to have Johnson testify in person would not have been allowed by the trial court.

¶ 107 Finally, even if it could be concluded that Smith's decisions not to agree to admit Johnson's entire testimony or seek a continuance amounted to deficient performance (which they did not), defendant cannot satisfy the prejudice prong of *Strickland* in this regard. Briefly, we have already analyzed, at length, that the evidence against defendant, minus Johnson's testimony, was overwhelming, so much so that the admission of just Johnson's direct testimony, which defendant describes as exculpatory, would not have created a reasonable probability that the outcome of his trial would have been different. Now considering, in this context, Johnson's testimony as a whole, not only do we not understand defendant's insistence that it would have aided his defense, but we cannot decipher any reason why it would have been prudent for any attorney to even conceive of the notion to seek to have this testimony admitted—testimony that objectively inculpated defendant in the crime much more than it exculpated him. If the exculpatory nature of Johnson's direct testimony cannot reasonably be said to have potentially changed the outcome of his trial, the inculpatory nature of his cross—presented alongside his direct, in person or not—certainly cannot do so. And, without prejudice, there can be no

ineffectiveness in Smith's decisions not to concede to the admission of Johnson's entire testimony or not to seek a continuance.

¶ 108   Ultimately, a defendant is entitled to reasonable, not perfect, representation from his defense counsel.  See *Fuller*, 205 Ill. 2d at 331.  We have remanded this cause twice upon defendant's inquiry to ensure that he received such representation at his trial.  After the full *Krankel* hearing, which the trial court conducted per our direction in a thorough, detailed, and substantive manner, we agree with it that this representation was secured.  Therefore, we find no manifest error in the trial court's determination that Smith was not ineffective in not securing a written agreement to stipulate to Johnson's direct testimony from codefendants' trials, nor in choosing not agreeing to admit his testimony in its entirety or ask for a continuance when it became clear Johnson's direct testimony would not be admitted on its own.  Accordingly, we affirm the trial court's dismissal of defendant's *Krankel* claim.

¶ 109   With this, we now address the three remaining claims defendant raised on appeal.

¶ 110                                         II. Motion to Suppress

¶ 111   Defendant next contends that the trial court erred in denying his pretrial motion to suppress his statements to police, which he gave the morning after the murder.  He claims that, as evidenced by the testimony of forensic psychology expert Dr. Joan Leska, his diminished intellectual capacity and the stress of the interrogation rendered him incapable of knowingly and intelligently waiving his *Miranda* rights.  He insists the court did not consider these, and several other, factors affecting his confession and, thus, its denial of his motion to suppress must be reversed and his cause remanded for a new trial.  We disagree.

¶ 112   Review of a trial court's denial of a motion to suppress proceeds via a two-part standard.

We accord great deference to the trial court's findings of fact and credibility determinations, and these will only be reversed if they are against the manifest weight of the evidence; we review *de novo* questions of law and the ultimate determination of whether the motion to suppress should have been granted. See *People v. Smith*, 2016 IL 119659, ¶ 43; accord *People v. Slater*, 228 Ill. 2d 137, 149 (2008). In conducting our review, we may consider not only the testimony adduced at the suppression hearing, but also the testimony adduced at trial. See *Slater*, 228 Ill. 2d at 149.

¶ 113   In seeking the admission of a defendant's confession at trial, the State has the burden to prove by a preponderance of the evidence that he waived his *Miranda* rights, which include his privilege against self-incrimination and his right to counsel. See *In re W.C.*, 167 Ill. 2d 307, 327 (1995). In addition to being voluntary, his waiver of his *Miranda* rights must be knowing and intelligent. See *People v. Braggs*, 209 Ill. 2d 492, 514-15 (2003). A knowing and intelligent waiver is one that reflects "an intentional relinquishment or abandonment of a known right or privilege." *W.C.*, 167 Ill. 2d at 327-28. This means he had full awareness of the nature of his rights and the consequences of abandoning them. See *W.C.*, 167 Ill. 2d at 328. That is, "[t]o waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail." *W.C.*, 167 Ill. 2d at 328. The mental state necessary for this involves the defendant's awareness of "the State's intention to use [his] statements to secure a conviction and of the fact that [he] can stand mute and request a lawyer." *W.C.*, 167 Ill. 2d at 328.

¶ 114   However, "[a] criminal suspect is not required to know and understand every possible consequence of a waiver" of his *Miranda* rights in order for him to make a knowing and intelligent waiver of them. *Braggs*, 209 Ill. 2d at 515. The test for determining whether the

defendant has knowingly and intelligently waived his *Miranda* rights "depends, in each case, on the particular facts and circumstances of that case," including the defendant's background, age, experience, conduct, and intelligence, as well as the totality of the circumstances surrounding the interrogation and an examination of whether, when considering all these factors, the words used imparted a clear and understandable warning of his rights. *W.C.*, 167 Ill. 2d at 328-29; see *People v. Bernasco*, 138 Ill. 2d 349, 368 (1990); see also *People v. Smith*, 178 Ill. App. 3d 976, 982 (1989), and *People v. Williams*, 128 Ill. App. 3d 384, 392 (1984) (both the characteristics of the accused and the details of the interrogation, including how the defendant answered the questions posed, are to be considered). While mental deficiency is one factor to be considered, evidence of a limited intellect, alone, is not proof that he was incapable of waiving his rights. See *Smith*, 178 Ill. App. 3d at 982; see also *W.C.*, 167 Ill. 2d at 328 ("mental deficiency, of itself, does not render a statement unintelligent"). Rather, and again, the central focus must be on the case at hand and its particular facts when viewed in their totality. See *People v. Brown*, 2012 IL App (1st) 091940, ¶ 40 (prior cases "are of limited value" when determining whether a particular defendant knowingly and intelligently waived *Miranda* rights).

¶ 115    Based on the ample record before us, it is clear that the totality of the circumstances surrounding defendant's interrogation demonstrate he knowingly and intelligently waived his *Miranda* rights when he gave his confession to police.

¶ 116    As noted, before trial, defendant filed a motion to suppress his statements asserting he had "severe cognitive deficiencies" that, when coupled with his "unstable mental and emotional state" and drug intoxication, prevented him from knowingly and intelligently waiving his *Miranda* rights. At the ensuing pretrial hearing, the State presented the testimony of Detective

DeYoung. In brief, he stated defendant was arrested soon after the murder at about 10:45 p.m. and was questioned the next morning at about 8:20 a.m. When defendant was arrested, he was searched upon his arrival at the station and then monitored via video camera; no drugs were found on his person and Detective DeYoung never saw him take any drugs. Defendant was placed in a room by himself which had a bed, he remained unhandcuffed, and he was given water to drink. The police interview lasted approximately 50 minutes, and defendant was given a break when he asked for one, during which police left him alone for some 17 minutes.

¶ 117   Detective DeYoung further testified that he presented defendant with a preprinted form containing all the written *Miranda* rights. He first asked defendant if he could read and write. Once defendant affirmed he was able to, he listened as defendant began to read the form out loud. After he let defendant finish reading the form on his own, Detective DeYoung asked him twice if he understood the rights he had just read. When defendant acknowledged he did, Detective DeYoung then read the form out loud to him, and again asked him if he understood his rights; defendant signed the form. After that, the interview proceeded in a question-and-answer format, with defendant providing details about the murder, those involved, and his own participation, and it concluded when he wrote and signed a statement about the crime.

¶ 118   To challenge Detective DeYoung's testimony, defendant presented Dr. Leska. She testified that she had interviewed him sometime during the course of this matter, whereupon he told her he had been "high" at the time he gave his statement to police because he had taken drugs all the day on the day of the murder and again at the police station right before he walked into the interview room. She stated that defendant also told her he was anxious and fearful during the interview, and she opined that this, along with comments he made during the

56

interview about his life being over, showed he was distracted and inattentive and, thus, he did not have the ability to attend to, focus and process the information given to him regarding his *Miranda* rights. The bulk of her testimony centered on her psychological testing of defendant, which included a *Miranda* evaluation and a *Miranda* comprehension test. According to Dr. Leska, these placed defendant in the borderline-to-low average range of intellectual functioning and, when combined with his stress and intoxication, "seriously impacted" any ability he may have had to knowingly and intelligently waive his *Miranda* rights.

¶ 119 However, on cross-examination, Dr. Leska admitted that defendant performed "adequately well" on the *Miranda* comprehension test, which evaluates one's ability to understand his rights. According to her, this indicated he did have the ability to knowingly, intelligently, and voluntarily waive his *Miranda* rights; she opined, however, that he had not adequately read his rights. She also admitted that there was no evidence of physical or psychological police coercion during the interview, and that the interview was "relatively brief." She further acknowledged that, when she interviewed defendant, he spoke in full sentences and had no difficulty in his thought process or in answering questions appropriately. He was able to read a consent form she provided him completely and with fair pronunciation and was able to identify its pertinent elements regarding medical treatment and confidentiality.

¶ 120 The trial court denied defendant's motion to suppress based on the "totality of the circumstances" presented. In its detailed colloquy, it compared Detective DeYoung and Dr. Leska's testimony, and examined the video of defendant's interview, his allegation of drug use, and his intellectual capacity. It found the video corroborated Detective DeYoung's testimony. It noted defendant's "body language" and "reaction to things" did not indicate he was under the

influence of drugs while speaking to police, and he was not "passing out" nor did police have to "continue to try to get his attention" during the interview. In contrast, the court "had problems" with Dr. Leska's testimony, which it found was based mostly on defendant's "self-serving" statements to her. For example, Dr. Leska accepted defendant's statements about being under the influence of drugs at the time of his interview and considered it in her evaluation, but defendant's mother and girlfriend told her he had stopped using drugs over a year ago and Detective DeYoung testified he was searched and monitored while at the station and no drugs were found on him. The court also found Dr. Leska's intellectual evaluation "incongruous," noting it did not believe her testimony that defendant could not understand the short and simply-worded preprinted *Miranda* form but could understand her consent form, which was much more complex and took her, per her own testimony, five minutes to go over and explain to him. In addition, the court discussed other factors of note, including that it had no doubt defendant was fearful, as anyone being interrogated about a murder would be; that people make mistakes even in the simplest actions of spelling when under such stress; and that experiencing reading issues does not prevent someone from understanding what is explained to them.

¶ 121    We find no error with the trial court's findings of fact and credibility determinations, nor do we find any basis in the record upon which to reverse its denial of defendant's motion to suppress his confession. With regards to the former, as already discussed, the court found Detective DeYoung to be credible and his testimony corroborated by the video of defendant's confession, and it found Dr. Leska to be less credible and her testimony to have been based on defendant's self-serving, uncorroborated statements to her and incongruities it found in her testing and evaluation of him. Their testimony at trial borne out these points and, thus, we agree

with the trial court. See *Smith*, 2016 IL 119659, ¶ 43 (great deference lies with trial court's findings of fact and credibility determinations in evaluating waiver of *Miranda* rights).

¶ 122   Additionally, we concur with the trial court's comments regarding the universality of inherent fear and stress involved in interrogations, and the fact that one need not be able to read at a high level to understand what is being explained. As announced earlier, a defendant does not need to know and understand "every possible consequence of a waiver" in order to knowingly and intelligently waive his *Miranda* rights. *Braggs*, 209 Ill. 2d at 515. Rather, we must conduct an evaluation of the facts attendant to his background, age, experience, conduct and intelligence, as well as review the totality of the circumstances surrounding the interrogation to determine if, when considering all these, he had a clear and understandable warning of his rights and, thus, made a knowing and intelligent waiver of them. See *W.C.*, 167 Ill. 2d at 328-29; see also *Smith*, 178 Ill. App. 3d at 982, and *Williams*, 128 Ill. App. 3d at 392. In our review of the facts, and in our consideration of the totality of the circumstances, we conclude, in line with the trial court, that such warning and waiver occurred here.

¶ 123   Defendant was 35 years old at the time of the murder. He had no history of any psychological problems or treatment, nor of any general cognitive difficulties. He attended two years of high school. He had been arrested 14 times in 18 years and, though he points out they were not for crimes as serious as this one, those arrests nonetheless indicate he was familiar with his *Miranda* rights. Defendant's interview in this case lasted less than an hour and it took place less than 11 hours after he was brought to the police station. Beforehand, he was kept in a room with a bed, he was by himself, he was given water to drink, and he remained unhandcuffed. During the interview, he was given a break when he requested one; officers left the room and let

him be alone for over 15 minutes. Before speaking to him, Detective DeYoung first asked defendant if he could read and write; defendant said he could and he demonstrated this by beginning to read the preprinted *Miranda* form out loud. Detective DeYoung gave him time to finish reading the form to himself, after which he asked defendant, twice, if he understood what he had read. Defendant confirmed that he did. Detective DeYoung then went so far as to read the form to defendant, and he again asked him if he understood his *Miranda* rights. Defendant signed the form of his own accord.

¶ 124   The interview proceeded with Detective DeYoung asking defendant questions and defendant answering them. Defendant did not exhibit any stress or fear initially when speaking generally about the crime, and he provided abundant information regarding those involved in the murder, their relationships, the motive, and various details of the plan, including his and codefendants' communications and locations throughout the day of the murder. Defendant also asked his own questions of police, such as whether the victim was dead and whether he was going to go to prison. Clearly, he understood the gravity of the situation. Defendant never indicated he did not understand his rights, and he wrote and signed his own confession at the conclusion of the interview.

¶ 125   What is more, Detective Pavini, who was in the interview room with Detective DeYoung and defendant, corroborated Detective DeYoung's description of the interview at trial. See *Slater*, 228 Ill. 2d at 149 (reviewing court is entitled to consider trial evidence, along with suppression evidence, in evaluating *Miranda* waiver). He testified that defendant was forthcoming with many details about the murder, he did not appear to be under the influence of any drugs during the interview, and he understood the magnitude of his situation as exemplified

by his questions regarding the victim and potential prison time. Detective Pavini also recounted that defendant corrected himself during the interview, without prompting, when describing that the passenger window of the Buick Century where the victim sat was up and not down (as he first stated), and that he demonstrated of his own accord how the gun jammed during the murder—both factors corroborated by the ballistic evidence presented.

¶ 126  To support his argument that he had a diminished intellectual capacity and could not understand his rights, defendant repeatedly highlights his misspellings when writing his confession, his contention that he was "high" during the interview, his anxiety and fear and, most critically, his low scores on the tests administered by Dr. Leska. However, none of these, individually or cumulatively, demonstrate he did not make a knowing and intelligent waiver.

¶ 127  Detective DeYoung averred that defendant needed some assistance in writing the words "gun" and "gave" and, when asked to write on the photograph of the gun he identified as the gun codefendant Bickham, Jr. gave him, he wrote "J.D." instead of "D.J." Requiring assistance in spelling some words in a confession does not establish a lack of understanding of one's *Miranda* rights. At most, it demonstrates defendant's limited education; however, as defendant completed two years of high school, it more aptly demonstrates his panic while memorializing, with sobering reality, the confession he had just given about the murder and knowing, after police responded to his questions, that the victim was indeed dead and he would most likely be going to prison for his part in the murder. Additionally, while defendant insists writing "J.D." instead of "D.J." is a marked transposition demonstrating his low intellect, the evidence demonstrates otherwise. At trial, evidence presented indicated that defendant and codefendant Bickham, Jr. were good friends and even referred to themselves as cousins. It is quite reasonable to conclude

that, while others may have referred to him as D.J., defendant, who was closer to him, may have generally referred to him in the more informal sense as J.D. to stress "Junior," instead of the more formal order of his name, "Devin, Jr." Defendant's emphasis on his drug use is similarly unremarkable. Even accepting his insistence that he took drugs the day of the murder, he was in police custody for 11 hours before he gave his confession. He was searched upon his arrival at the station and no drugs were found on his person, and he was monitored via video while in custody and no one saw him take drugs. Also, Detectives DeYoung and Pavini testified, and video of the interrogation showed, defendant was alert and responsive during the interrogation, and there was never any need for them to redirect his attention nor did he ever pass out. Moreover, any fear or anxiety defendant may have had was understandable: not only had he participated in a murder, but he was exposing a plot that involved a former police officer, codefendant Bickham, Sr. This was clear when he at first refused to sign codefendant Bickham, Sr.'s photograph, stating, "I can't sign that" and "He could take my family out, though;" however, he relented and signed it. Interestingly, as Detective DeYoung testified, defendant did not exhibit fear or anxiety in the early portion of the interview, when the general facts of the crime were shared and recounted. It was only when the interrogation became in-depth, namely, when he began revealing inculpatory details, that defendant became fearful and anxious.

¶ 128   Finally, while we acknowledge that defendant did not score high on Dr. Leska's testing, we do not believe, as defendant would have us, that her testimony was the linchpin in his claim that he was unable to understand and properly waive his *Miranda* rights. In contradistinction, we find Dr. Leska's admissions directly refute this intimation. For example, she stated defendant scored in the borderline-to-low average range on the *Miranda* evaluation, but he scored

"adequately well" on the *Miranda* assessment, the test she explained determines whether he understood his rights. This led Dr. Leska to admit on cross-examination that he had the ability to knowingly, intelligently, and voluntarily waive his rights; it was her opinion that he just did not adequately read them during the interview. One's own failure to adequately read the *Miranda* rights does not mean one is not able to understand them, and her opinion bears little weight in light of the evidence that Detective DeYoung not only gave defendant time to read them, but also asked him three separate times if he understood them, had him demonstrate his ability to read them, and read them to defendant out loud in full. Moreover, we further find Dr. Leska's testimony that defendant's fair pronunciation of, and ability to identify elements in, the consent form she provided him with when she interviewed him somehow demonstrated his inability to understand his *Miranda* rights to be similarly unavailing. That form, which is part of the record and which we have reviewed, is lengthy and contains terms and phrases like "unbiased evaluator," "psychological evaluation," "I understand that the information obtained in this evaluation including what I say is not confidential," and "the State requires the information obtained related to known or suspected child abuse or abuse of a person over 65 be reported to the State Health Department." Dr. Leska testified it took her five minutes to explain the form to defendant, and she was sure he understood it because he pronounced the words correctly. However, we note that the preprinted *Miranda* form here was much shorter, did not use similar complex terminology or phrasing, and defendant likewise read at least the beginning portion of it out loud to Detective DeYoung without a problem. Thus, Dr. Leska's testimony does not support defendant's claim.

¶ 129    Ultimately, after reviewing the totality of the circumstances in this case, including those

characteristics attendant to defendant and the details of the interrogation itself, we find that the facts presented here demonstrate he was provided with a clear and understandable warning of his *Miranda* rights and he knowingly and intelligently waived them. Accordingly, defendant's motion to suppress his statements to police was properly denied.

¶ 130                                III. Prosecutorial Misconduct

¶ 131   Defendant next asserts that his convictions must be vacated and his cause remanded for a new trial based on three instances of prosecutorial misconduct he claims, individually and cumulatively, deprived him of a fair trial and caused him prejudice in violation of his due process rights. Based on the record before us, we disagree.

¶ 132   As a threshold matter, the parties dispute the applicable standard of review, with defendant arguing for *de novo* review and the State advocating for review pursuant to an abuse of discretion standard. The Illinois Supreme Court has yet to resolve the long-standing conflict on this issue, created by its holdings in *People v. Wheeler*, 226 Ill. 2d 92 (2007), wherein, without much explanation, it applied a *de novo* standard to the review of prosecutorial comments, and *People v. Blue*, 189 Ill. 2d 99 (2000), wherein it followed countless decisions in applying the traditional abuse of discretion standard of review. See *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 139, and *People v. Hayes*, 409 Ill. App. 3d 612, 624 (2011) (outlining the dispute). While the case law may seem mixed, we have repeatedly and consistently employed the abuse of discretion standard, stating it more "properly invoke[s] over a century of Illinois Supreme Court precedent." *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 54, *rev'd on other grounds*; accord *People v. Cornejo*, 2020 IL App (1st) 180199, ¶ 128; *People v. Phillips*, 392 Ill. App. 3d 243, 274-75 (2009) (First District uses abuse of discretion to review prosecutorial comments). Thus,

we continue to employ that standard. However, because we find that defendant's claims fail substantively, he cannot prevail regardless of which standard is applied. See *People v. Potts*, 2021 IL App (1st) 161219, ¶ 254 (claim that comments by prosecution amounted to error had no substance based on record and would therefore fail under both standards).

¶ 133    A prosecutor has the right to comment on evidence and draw legitimate inferences therefrom, even if they are unfavorable to a defendant. See *People v. Simms*, 192 Ill. 2d 348, 396 (2000). "Whether a prosecutor's comments or arguments constitute prejudicial error is evaluated according to the language used, its relation to the evidence, and the effect of the argument on the defendant's right to a fair and impartial trial." *Simms*, 192 Ill. 2d at 396. "Prosecutorial misconduct warrants reversal only if it 'caused substantial prejudice to the defendant, taking into account the content and context of the comment[s], [their] relationship to the evidence, and [their] effect on the defendant's right to a fair and impartial trial.' " *People v. Love*, 377 Ill. App. 3d 306, 313 (2007) (quoting *People v. Johnson*, 208 Ill. 2d 53, 115 (2004)). A trial court may cure improper comments by giving the jury proper instructions on the law to be applied, by informing the jury that arguments are not evidence and must be disregarded if not supported by the evidence presented, or by sustaining the defendant's objections. See *Simms*, 192 Ill. 2d at 396-97. Ultimately, while a prosecutor's remarks may sometimes exceed the boundary of proper comment, a verdict must not be disturbed unless it can be said that the remarks resulted in substantial prejudice such that, absent those remarks, the verdict would have been different. See *People v. Byron*, 164 Ill. 2d 279, 295 (1995); accord *People v. Nieves*, 193 Ill. 2d 513, 533 (2000) ("comments constitute reversible error only when they engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted

65

from those comments"); *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994) ("even improper remarks do not merit reversal unless they result in substantial prejudice to the defendant").

¶ 134   With these principles in mind, we turn to the comments raised by defendant on appeal.

¶ 135                         A. Color of Wedding Dresses

¶ 136   The first instance raised by defendant took place at the start of trial, when the State presented the testimony of Mary Alexander, the victim's mother.  Before trial, one of the many motions *in limine* defendant filed was to exclude evidence of certain details of the victim's personal life, including that at the time of the murder she was planning her wedding, along with the details about it.  In deciding the motion, the trial court ruled the State should be "allowed to get into the fact that she's planning the wedding" since this went to motive for the murder, but details about "the place, date, and colors planned" were "not appropriate."  More discussion was had, and the court clarified that, again, while she was planning the wedding was relevant to the case, "the colors of the dresses and everything else" were not.  Upon modifying its statement to allow information about the place and date of the wedding, the court asked the State if its decision was "clear enough" and the State said it was, confirming it understood that planning the wedding and the place and date were admissible, but "specific details about the color of the dresses, you are not allowing."

¶ 137   At trial, the State presented the motive for the victim's murder: the victim was engaged to and pregnant by codefendant Bickham, Sr., who was already married to someone else, and while she was planning their wedding and move out-of-state in just two months' time, codefendant Bickham, Sr. asked his son, codefendant Bickham, Jr., to recruit defendant to participate in a murder-for-hire.  Mary was called as one of the first witnesses and, while she was testifying, the

66

State elicited testimony, as permitted, about the victim's engagement to codefendant Bickham, Sr., that a wedding date was set for August 27, 2011, which would have been the victim's deceased father's birthday, and that the ceremony was planned for Montrose Beach. Then, the State asked her if she had "become aware of what color, if any, would be selected for the women's dresses?" The defense objected, and the trial court sustained the objection.

¶ 138 Plainly, the State violated the motion *in limine*, which was undeniably clear and reaffirmed by its own words repeating the trial court's ruling that the color of the dresses at the wedding would not be permitted into evidence. The State concedes the prosecutor erred.

¶ 139 Was this error flagrant? Defendant would argue so. Yet, we are operating on a cold record, without the benefit of having been present when the question was asked. We note pretrial proceedings were long. Additionally, neither the question nor the topic of dresses or color was repeated at trial ever again. The State immediately moved on to other topics the moment the defendant objected, the court sustained the objection, and the question remained unanswered.

¶ 140 The more important question, in line with the principles announced earlier, is whether this error resulted in substantial prejudice to defendant such that, absent the question about dress color, his verdict would have been different. Even accepting that the State exceeded the boundary of proper comment, this can hardly be said to have engender substantial prejudice so as to call into question the guilty verdict. This is because "violation of a motion *in limine* is not *per se* reversible error." *Griffin v. Prairie Dog Limited Partnership*, 2019 IL App (1st) 173070, ¶ 107. Rather, reversible error only occurs if "the order is specific, the violation is clear, and the

violation deprived defendant of a fair trial." *Griffin*, 2019 IL App (1st) 173070, ¶ 107.

¶ 141   The trial court's order was specific.  And, the State's violation, cold record or not, was clear.  However, it cannot be said that this violation deprived defendant of a fair trial.  The jury was already cognizant of a majority of the details regarding the wedding.  As noted, this was part of the State's theory of the case—it was the crux of the motive for the victim's murder.  The jury knew she was engaged to codefendant Bickham, Sr., she was pregnant, she was planning the wedding with the help of her mother and sister-in-law, she had picked August 27, 2011 as the wedding date because that was her deceased father's birthday, this date was only two months away from the date of her murder, and she had planned a beach wedding on Montrose Beach. Per the trial court's ruling on the motion *in limine*, the admission of all this evidence was proper.

¶ 142   Considering this, as well as the overall length and factual intricacy of this trial, and particularly the detailed murder plot, we fail to see how, in the grand scheme of it all, one isolated question mentioning the color of wedding dresses, though admittedly a violation of a motion *in limine*, somehow deprived defendant of a fair trial.  Plainly put, we cannot conceivably say, and do not find, particularly in light of the evidence presented, that a sole question about the color of the dresses which went unanswered and was immediately objected to and sustained somehow engendered substantial prejudice so as to call into question defendant's guilty verdict. Therefore, while there was admitted error due to a violation the motion *in limine*, the comment neither caused reversible error nor deprived defendant of a fair trial.

¶ 143                    B. Exchange Between Counsels

¶ 144   The second instance of alleged prosecutorial misconduct raised by defendant took place during an exchange between defense counsel and the State while defense counsel was cross-

68

examining Detective Pavini. The State had elicited testimony on direct that while he was interviewing defendant at the station, Detective Pavini knew a preliminary GSR test had been administered, but he did not know the results. On cross-examination, defense counsel confirmed with Detective Pavini that the preliminary GSR test had been performed on defendant and then said, "And that was negative, right?" As noted earlier, the record shows that at this moment, two ASAs raised objections, with another saying, "Unbelievable," and one of them recommended that the record be corrected "now." Defense counsel apologized and the exchange between the parties and the court continued:

"[DEFENSE COUNSEL]: Whoa, whoa. Excuse me.

[ASA]: I want to approach.

THE COURT: Relax.

[ASA]: That is a misstatement.

THE COURT: All right. I sustained the objection.

[DEFENSE COUNSEL]: Judge, it is a mistake. Then I will take it back. We have all made mistakes.

[ASA]: Judge --

THE COURT: The objection is sustained. It's a misstatement. That didn't happen. You can go ahead.

[DEFENSE COUNSEL]: Let me cure it, please.

[ASA]: Thank you. Thank you."

Questioning continued and, with the trial court's permission, defense counsel corrected herself by asking Detective Pavini if he knew about the GSR test results before interviewing defendant,

to which he responded, "No."

¶ 145    Later, during his posttrial motion for a new trial, defendant alleged that this exchange constituted "an outburst" by the State that was "loud," "impugned the integrity of [defense counsel who was] asking the questions" and, therefore, denied him a fair trial.  The trial court, acknowledging that this situation "cries out for some sort of description to some extent, because the record only describes words," stated for the record that this was "a trial of some magnitude" with important issues, and that such situations result in "emotional" attorneys who become "involved in their case."  It further described that two of the ASAs objected "vociferously" when defense counsel made her mistake, and that it had "to calm everybody down."  Then, in analyzing what occurred, the court stated:

> "And I think in terms of its impact on the jury from either side I think they merely -- and I really believe this.  I think they simply believed that the State objected as they should * * *.
>
> It may or may not have been necessary, but it was an emotional moment.  And I think that your [defense counsel's] explanation was heard by them, and I don't think any of those jurors took that to be anything other than a mistake by you or just a mistake.  And that -- so, in terms of that situation, I don't think it rose to anything."

¶ 146 Defendant claims on appeal that the State "threw a temper tantrum in front of the jury" amounting to a personal attack on defense counsel, in an effort to intentionally make "a scene" and make her appear "unethical," "sneaky," "shady," and insinuate that she did something "possibly illegal."  Defendant quotes much of the trial court's commentary and insists its declaration that the State objected "vociferously" proves its comments amounted to prosecutorial

70

misconduct and resulted in prejudice.

¶ 147   Had the court used the term "vociferously" believing the context of the State's objection amounted to prosecutorial misconduct which caused him prejudice, it would have said so; it did not.  In fact, the court made a record of all this precisely because it wanted to ensure there was "some sort of description" of the context of the situation, and not just the words of the cold record.  Upon reading the entirety of the court's colloquy on this point, it is obvious what it was saying, and it is nothing like the context defendant now paints on appeal.  As the court noted, yes, perhaps the State objected in a manner louder and more strenuously than normal, but the circumstances needed to be considered.  As the court viewed it, this was an "emotional" moment in a serious, intricate, and lengthy trial.  Defense counsel misstated the evidence, and the State had every right, and reason, to object.  And, in considering the impact all this may have had on the jury, the court concluded that it did not believe the jury viewed this as anything more than a mistake, cured by its sustaining of the objection.

¶ 148   We wholly agree.  First, this was not a "temper tantrum" on the part of the State.  The record shows that the trial court had to, as it described, "calm *everybody* down," defense counsel included and not just the ASAs.  (Emphasis added.)  Moreover, defense counsel did, indeed, make a mistake; she misstated the evidence, she knew it immediately, and she admitted it.  An objection was clearly warranted on the part of the State and was so lodged.  Perhaps it was "louder and more vociferously" than normal.  But, this easily could have been because as the record shows, quite literally only moments before, the State had asked Detective Pavini the very same question on direct and he had just answered that he did not know the results of the preliminary GSR test while interviewing defendant.  More significantly, defense counsel's

71

misstatement went to the heart of one the most critical pieces of evidence against defendant in this cause. Intentionally or not, by her misstatement, defense counsel insinuated defendant's GSR test was negative. Yet, it was undisputed defendant tested positive for GSR, and this was important because the other person defendant was attempting to show he was mistaken for, codefendant Bickham, Jr., tested *negative* for GSR. From the perspective of any prosecutor, such a misstatement would naturally draw objection, and a strenuous one, at that.

¶ 149 All in all, we understand defendant's point that perhaps a more professional approach could have been for the State to have let Detective Pavini answer the question in the negative, clear it up on redirect, or seek a sidebar. But, none of this is required. At its core, this situation saw defense counsel misstate key evidence in front of the jury. The State was not required to object outside the jury's presence. Ultimately, the trial court sustained the objection, defense counsel apologized and corrected her mistake, and the State thanked her, whereupon the trial moved on. Clearly, civility eventually reigned in a heated moment. We find no error here, and certainly no substantial prejudice to defendant warranting the reversal of his convictions.

¶ 150                        C. Rebuttal Closing Argument

¶ 151 Defendant's final citation of prosecutorial misconduct centers on the State's rebuttal closing argument, as given by ASA McKay. Citing two prior, and wholly separate, criminal cases from the early 2000s of which ASA McKay was part, defendant claims that he "has a history of exceeding the bounds of propriety in closing argument," which he exercised again in the instant cause. Next, he cites a multitude of individual comments for our review and then asserts overall cumulative error, as well. We will not entertain defendant's argument about prior criminal cases involving ASA McKay; we would not evaluate any currently licensed attorney,

defense counsel included, based on comments made during cases outside of what is immediately before us. See *People v. Bryant*, 94 Ill. 2d 514, 523 (1983) (quoting *People v. Weathers*, 62 Ill. 2d 114, 120 (1975)) (a case where the propriety of closing remarks is at issue " 'must be decided upon its own facts' "). As to defendant's claims of individual and cumulative error, we acknowledge that the State may not engage in inflammatory and unfounded rebuttal closing argument. See *Bryant*, 94 Ill. 2d at 523. However, based on the record, we find, as the trial court here did in denying defendant's motion for mistrial, there was no reversible error.

¶ 152 The general principles regarding prosecutorial comments outlined earlier, namely, that the State has the right to comment on evidence and draw legitimate inferences therefrom even if they are unfavorable to a defendant, and that cited comments are reviewed for substantial prejudice and the verdict reversed only if it would have been different, hold true for rebuttal closing argument. See *Simms*, 192 Ill. 2d at 396, and *Nieves*, 193 Ill. 2d at 533. Moreover, we note that the State is allowed a great deal of latitude in this arena. See *People v. Caffey*, 205 Ill. 2d 52, 131 (2001). We examine any allegedly improper remarks for substantial prejudice in light of all the evidence presented (see *People v. Flax*, 255 Ill. App. 3d 103, 109 (1993)), as well as within the full context of the entire closing argument itself (see *People v. Cisewski*, 118 Ill. 2d 163, 176 (1987)). Unless deliberate misconduct by the State during closing argument can be demonstrated, comments will be considered incidental and uncalculated and will not form the basis for reversal. See *People v. Cloutier*, 156 Ill. 2d 483, 507 (1993).

¶ 153 Furthermore, "[s]tatements will not be held improper if they were provoked or invited by the defense counsel's argument." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Thus, when a defendant's own closing argument attacks the State's case and its witnesses, the State is entitled

to respond thereto in its rebuttal closing argument, particularly when that response is invited; in such an instance, the defendant cannot then claim prejudice. See *Nieves*, 193 Ill. 2d at 534 (defendant cannot rely upon invited response by State during rebuttal closing argument as error on appeal); accord *People v. Reed*, 243 Ill. App. 3d 598, 606-07 (1993).

¶ 154   In addition, we note for the record that, as the State points out, defendant has not properly preserved some of the rebuttal closing comments he now argues on appeal since, though he lodged objections against them at trial, he did not raise them in his posttrial motion and, thus, he has forfeited their review in our Court. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve review, a defendant must both object at trial and in written posttrial motion); *People v. Ward*, 154 Ill. 2d 272, 293 (1992) (failure to do both operates as forfeiture). Defendant did not address forfeiture nor did he argue for the application of plain error to save his claims in his opening brief. Rather, only after the State pointed out his forfeiture in its brief on appeal did defendant, for the first time in his reply brief, acknowledge that they were unpreserved and argue that they should be considered pursuant to the second prong of plain error.

¶ 155   Since points not argued in opening briefs are forfeited and are not to be raised or argued for the first time in reply briefs, we have every right to refuse to address those comments of alleged prosecutorial error that defendant has not properly preserved. See Ill. S. Ct. R. 341(h)(7) (eff. Nov. 1, 2017); *People v. Taylor*, 2019 IL App (1st) 160173, ¶ 41. However, with this case before us for the third time, and ultimately for the sake of a final, whole, and complete disposition of this appeal, we will address them under the second prong of plain error, as defendant requests. Under this prong, an unpreserved error can be considered if "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's

74

trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatowski*, 225 Ill. 2d 551, 565 (2007); accord *People v. Jenkins*, 2016 IL App (1st) 133656, ¶ 25. Significantly, this is not a general savings clause but, rather, a narrow and limited exception to forfeiture. See *People v. Huron*, 215 Ill. 2d 167, 177 (2005). Defendant has the burden of persuasion (see *People v. Lewis*, 234 Ill. 2d 32, 43 (2009)), and must prove there was plain error and that the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process (see *Huron*, 215 Ill. 2d at 187). The first step of plain error review is to determine whether any error occurred, for if there was no error, there can be no plain error. See *Lewis*, 234 Ill. 2d at 43. Errors under the second prong have been equated with structural errors, and there are only a limited class of these. See *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 78. Specifically, "[e]rror in closing argument does not fall into the type of error recognized as structural." *Cosmano*, 2011 IL App (1st) 101196, ¶ 78.

¶ 156 Defendant classifies the State's allegedly improper rebuttal closing remarks into three categories. As we discuss herein, we find no error—individual, plain, cumulative, or otherwise—in any of the cited comments that would require reversal of his convictions.

¶ 157 *i. Disparagement of Defense Counsel*

¶ 158 Defendant asserts that the State made several comments during rebuttal closing argument that disparaged defense counsel and "showed extreme disdain for" his theory of the case, consequently shifting the jury's attention away from the evidence. In brief,[8] he cites a comment wherein the State called his theory "offensive," another wherein the State analogized his theory

---

[8] The comments cited by defendant span over four pages of the record, which he reproduces in his brief. We have reviewed the record, and these comments in particular, thoroughly. Thus, and for the sake of length of this decision, we will not reproduce them here.

to *The Wizard of Oz*, and several wherein the State told the jury what it, or defendant, or the defense team wanted them to do, such as what inferences to make or what evidence to consider.

¶ 159    First, with respect to use of the word "offensive," the State was addressing defendant's recurring argument, presented throughout trial and closing argument, that he was only a "patsy" or "fall guy" and had no idea about either the plan to murder the victim or what occurred, as he was simply driving around as a passenger in the car with codefendant Bickham, Jr. and never left it. The full context of the comment, as contained in the record, shows that the State made it while reminding the jury of all the physical evidence against defendant—evidence that defense counsel spent closing argument attacking and discrediting. The State described there was only one victim that night, Chervon, and defendant's theory that he was used as a "patsy" or "fall guy" by codefendants was not believable in light of the evidence, *i.e.*, that he was a male well into his adulthood driving around with a significantly much younger codefendant Bickham, Jr., he was in the car with the murder weapon, there were text messages exchanged among the men, he had GSR on his shirt, and his DNA was on the gun. The State argued one would have to believe he was the "victim of bad luck" to believe his patsy theory, and to consider him a victim was "offensive" to Chervon's family.

¶ 160    We find no error. The State argued the evidence presented and directly attacked defendant's theory of the case, which it was allowed to do; and, the inferences the State made were rational. The crux of defense counsel's entire closing argument asked the jury to believe he was in the wrong place at the wrong time when police pulled over the Impala with the murder weapon inside and to believe he was being used by codefendants as a scapegoat—in other words, that he was a victim of the circumstances. The State argued in response during its rebuttal that it

was "offensive" to argue this pursuant to the evidence against him and when the only person dead was Chervon. Contrary to defendant's insinuations on appeal, the State was not attacking defense counsel personally but, rather, her argument, which was well-known to the jury by this time. The State had every right to comment on the credibility of defendant's theory, and were there any prejudice with the mere use of the word "offensive" (which there was not), the trial court sustained defendant's objection and cured it.

¶ 161 We likewise find no error in the State's reference to *The Wizard of Oz*. The State argued that defense counsel's patsy theory reminded it of the end of that movie when "the curtain is pulled" and "the Wizard scream[s], 'pay no attention to that man behind the curtain'. They don't want you to pay attention to all of the evidence." Again, defense counsel spent a great portion of her closing argument insisting defendant had no part in forming the murder plot nor in carrying it out. In support of this theory, she attempted to discredit every piece of evidence linking defendant to the murder and paint him as a strawman used by codefendants. In response, the State made a reference to a scene from a classic, culturally universal movie that deals, in part, with the theme of accountability and deflecting attention. As we view it, the comment was not, as defendant intimates, an attempt by the State to imply that defense counsel was like the Wizard and was "fabricating an illusion" to deflect the jurors' attention. Rather, it went to the crux of the case. A direct point of contention in this matter was which of the three people accused of this murder knew of it and worked together to commit it. Defendant's main argument was that he knew nothing about anything—that he was codefendants' strawman. Essentially, the State was merely reminding the jury, in response to the patsy theory, to "pay attention to the evidence, all of the evidence." Just as with the previous comment, we find no error and, were there any

prejudice in the State's reference to the movie, the trial court sustained defendant's objection to this comment and cured it.

¶ 162    The remaining comments in this category of alleged error encompass those wherein the State told the jury what it, or defendant, or the defense team wanted them to do such as what inferences to make or what evidence to consider, as well as the State's alleged insinuation that to acquit defendant the jury would have to believe all the forensic witnesses lied and conspired against him.  In context, however, the cited remarks were not so erroneous as to cause prejudice meriting reversal here.  With respect to the former group, the record shows that the trial court sustained defendant's objections as to what the State told the jury what it, or defendant, or his counsel wanted them to do.  In fact, the court commented specifically on this during defendant's motion for mistrial and noted that not only did it sustain his objections, but also that after the first several times, the State "stayed away from that" for the remainder of rebuttal argument.  With respect to defendant's claim that the State insinuated a conspiracy, this is one of the instances where he has forfeited his argument; he admits in his reply brief that he did not object at trial. Under plain error considerations, we find no error and, thus, no plain error.  The State never used the word "conspiracy" nor ever told the jury that, in order to acquit defendant, they must find that all the forensic witnesses conspired against him.  Rather, when this portion of the rebuttal is read and considered in the entire context, it is clear the State was attacking the credibility of defendant's theory that he was a patsy in light of the many forensic witnesses who presented physical evidence directly linking him to the murder.  The State's comments did not lessen its burden of proof, as defendant insists.  Again, challenging the credibility of defendant's theory and rehabilitating the credibility of its own case is something the State had every right to do,

especially in response to defendant's own closing argument which attacked the forensic evidence.

¶ 163                                  *ii. Misrepresentation of the Law*

¶ 164    The second category of rebuttal closing comments defendant raises are those in which he claims the State misrepresented the law. The cited passage begins with the State, as noted earlier, challenging the credibility of defendant's theory that he was merely a patsy. It was commenting on evidence presented, including defendant's confession, demonstrating that the murder-for-hire had been planned by the three men for some time, thereby showing he was not an innocent bystander just sitting in the Impala with no knowledge of the crime. It asked the jury to think about what his presence in the car meant and what roles each of the men had in relation to all the evidence presented, particularly the forensic evidence. The State explained:

> "[THE STATE]: If you think Junior is the shooter without any physical evidence
>
> linking Junior to being the shooter, then [defendant]'s still responsible.
>
> [DEFENSE COUNSEL]: Judge, objection, there's no evidence of that.
>
> THE COURT: Overruled. He can argue the facts and his inferences.
>
> [THE STATE]: He's legally responsible for the conduct of another. Why is he there if
>
> he's not the shooter? Lookout, co-driver. If Senior's the shooter, then he brought the
>
> gun to Senior. Which means he's accountable. He's legally responsible for the conduct
>
> of Devin Bickham, Sr. Senior needs a gun if Senior is the shooter. And if Junior brought
>
> the gun from the car parked in that dark neighborhood, if Junior brought the gun, who is
>
> the lookout for Junior and Senior? Who is the wheel man? Who is making sure there

aren't any police cars driving by? Either way, either way, he loses, and he's guilty.

    [DEFENSE COUNSEL]: Your Honor, we object to that whole line of argument.

    THE COURT: Overruled."

Defendant argues that the State's comments were "not legally accurate" because, if the jury believed his theory, then his mere presence in the Impala while codefendants committed the crime is insufficient to make him accountable. Defendant mischaracterizes the record.

¶ 165 First, the record shows the comments were invited. In his own closing argument, defendant discussed accountability. Throughout the trial, he argued that there was no evidence to show he was part of the murder-for-hire. In closing, defense counsel stated:

    "I'm confused a little bit by the accountability argument. Certainly[,] if a person and another person agreed that they're going to do something together and then person A sits in the car and person B goes out and does a shooting and then comes back to the car and they drive off and this was at the behest of person C; A and C and B are all accountable for each other. And A and B are all accountable for the shooting, but that's not what happened in this case. The prosecution is telling out their theory, what they believed happened here is that [defendant] is the shooter, not the dad, not the son. So what evidence is there that he is accountable? Where does he aid[e], abet, assist?"

The State's over-arching theory in prosecuting all three men was that they made a plan to commit the murder and carried it out together. With respect to defendant, it presented GSR and DNA evidence that he either committed the shooting or was very near in proximity to the shooting and/or the gun which, along with phone records and his own confession, showed he was responsible for the events. The State's comments inferred the many alternative ways he could

have been responsible: he could have been the shooter, bringing the gun from the Impala to the park; or, codefendant Bickham, Sr. could have been the shooter and defendant was the one who took the gun and ran away from the park; or, he could have stayed in the car while codefendant Bickham, Jr. went to retrieve the gun and came back to the car to drive it away. Under defendant's theory, or any of those raised by the State, defendant could be accountable for murder. The State was free to make these inferences based on the evidence presented, and the jury was free to accept or reject them.

¶ 166 Additionally, we do not find defendant's argument that the State misstated the law of accountability to be persuasive. Defendant explicitly asked in closing, "Where does he aid[e], abet, assist?" The State answered this with several possibilities based on the evidence: his DNA on the gun, to the exclusion of codefendant Bickham, Jr. who was in the car with him, indicated he handled the murder weapon; GSR on his white buttoned-down shirt, while codefendant Bickham, Jr. tested negative for GSR, indicated he could have been the shooter or again, at the very least, handled the murder weapon; the phone call/text evidence linked him to codefendants; and his confession verified that he was part of the plan and helped codefendants execute it. The State's comments, then, were fully in line with, and couched in, the evidence to show the jury, in response to defendant's argument in closing, where he did "aid[e], abet, assist" codefendants in the murder. See, *e.g.*, *People v. Fernandez*, 2014 IL 115527, ¶¶ 13-14, *W.C.*, 167 Ill. 2d 307, 337 (1995), and *People v. Petrov*, 2023 IL App (1st) 160498, ¶ 96 (discussing the law of accountability and the common design rule, which provides that where two or more persons engage in a common design or agreement, any acts in furtherance thereof committed by one is considered to have been committed by all so that all are equally responsible; and holding

common design can be inferred from the circumstances surrounding perpetration of a crime).

Therefore, and just as the trial court, we find the State's comments centered on the facts and

potential inferences to be gleaned therefrom and, thus, did not constitute error.

¶ 167                                    *iii. Misrepresentation of the Facts*

¶ 168   In his third, and final, category of allegedly improper rebuttal closing comments,

defendant claims the State made six misrepresentations of facts.  He properly preserved four of

these; he forfeited two.[9]  As noted, for the completeness of the record, we choose to address

them all, and for the reasons discussed, we find no reversible error.

¶ 169   In the first cited instance, the State commented about eyewitness Fumo: "She told you * *

* that scared nervous teenager told you, 'I didn't even know the color of his shorts.' "  Defendant

claims this misstated the evidence because defense counsel had elicited testimony from Fumo

that she told police two days after the murder the man she saw running wore lighter-colored

shorts.  While defendant is correct, he ignores the remainder of her testimony.  As noted earlier,

when defense counsel first asked Fumo whether the man was wearing lighter-colored shorts, she

stated she could not remember.  Then, after defense counsel confronted her with her statement to

police, she repeated that, as she was testifying now, she could not "specifically remember" what

color the shorts were.  The fact that defense counsel elicited testimony from Fumo that she

identified the light-colored shorts to police days later does not negate that she also testified that,

despite this and as she was testifying now, she could not remember what color the shorts were.

The State in no way misrepresented Fumo's testimony.  Rather, it provided the jury with its

---

[9] Those forfeited refer to defendant being in the Impala during two of codefendants' phone conversations, and defendant being familiar with GSR.

complete gist in response to defense counsel's attempts to use only a portion of it to defendant's advantage as a means to discredit the evidence against him.

¶ 170    As to the final five comments, defendant claims the State made arguments "based on numerous facts that simply were not in evidence." Based on our review of the record, and particularly of the evidence presented and of closing arguments as a whole, we do not find error in any of these comments as they constituted reasonable inferences and/or invited responses to defendant's closing argument.

¶ 171    For example, the State suggested that, if codefendant Bickham, Jr. were the shooter or took the gun from the shooter at the park, he could have "wip[ed] gunshot residue on th[e] steering wheel" of the Impala, hence his negative GSR test result. This was in response to, and attempted to dispute, defendant's assertion during closing that he could not have been the man who ran away from the park with the gun because, had it been him, he would have had to pass the gun to codefendant Bickham, Jr., who would have had to put it under the driver's seat since he was driving and, as codefendant Bickham, Jr. tested negative for GSR, defendant's explanation that his own positive GSR came from a different gun—one he fired earlier that same day in another part of town—had to be true. Additionally, the State's comment was based on expert forensic testimony presented at trial that particles on one's hands transfer to surfaces touched. Accordingly, in rebuttal closing, the State explained it was reasonable to infer from this that codefendant Bickham, Jr. received the gun from defendant and put it under his seat, but he tested negative for GSR because he wiped it on the steering wheel since he was the driver, thereby discrediting defendant's explanation.

¶ 172    Next, the State asked what defendant and codefendant Bickham, Jr. could have been

83

talking about during one of their phone calls that evening and suggested defendant may have told him, "Okay, come get me. * * * Pick me up." This related directly to evidence presented at trial regarding the times and content of phone calls and texts exchanged between codefendants and between codefendant Bickham, Jr. and defendant. These were outlined for the jury and showed, in brief, that codefendant Bickham, Jr. and defendant contacted each other more than once in the few hours before the murder; codefendant Bickham, Sr. later texted codefendant Bickham, Jr. that he and the victim were going to the park; and codefendants then exchanged a series of texts regarding their locations minutes before the murder. It was undisputed that codefendant Bickham, Jr. and defendant had not been together the entire day; at some point they met up, and codefendant Bickham, Jr. was driving his father's car. It was reasonable for the State to infer that one of the discussions between codefendant Bickham, Jr. and defendant, then, was about the former picking up the latter.

¶ 173   In this vein, and while continuing to review the phone call/text evidence, the State portrayed that defendant was "sitting in the car with" codefendant Bickham, Jr. when codefendants exchanged two phone calls minutes before the murder. This inference was more than reasonable for the State to make. The evidence showed codefendants exchanged calls at 10:05 p.m. and 10:08 p.m., the 911 call occurred a few minutes later, and police stopped the Impala at approximately 10:20 p.m. very near to the park. Most significantly, defendant never denied being in the Impala. In fact, this was his entire defense: he was in the Impala at the time of the shooting and never left it. With the evidence demonstrating that codefendants exchanged two calls only minutes before the murder and that codefendant Bickham, Jr. and defendant were apprehended in the Impala together near the park, it was quite reasonable to infer defendant was

in the car with codefendant Bickham, Jr. when the phone calls took place.

¶ 174   Defendant also takes issue with a comment by the State that he knew codefendant Bickham, Jr. was "in another room" in the police station while he was there.  However, this was a proper inference.  The evidence showed that police pulled them over together, conducted a show-up identification of them together, and drove them to the same police station.  Additionally, Detective DeYoung testified that when he interviewed defendant, he told him he had been talking to codefendant Bickham, Jr. and he wanted to know defendant's version of events.  It was reasonable for the State to comment, then, that defendant knew codefendant Bickham, Jr. was in another room at the station.

¶ 175   In the last comment cited by defendant, the State said he "knows about gunshot residue." Defendant insists there was no evidence that he knew anything about GSR at all.  However, and again, the comment was an invited, proper inference for multiple reasons.  First, as the State points out, defendant gave his statement to police after a GSR test was performed on him, so he knew he had been tested for GSR.  Moreover, defendant told police that he had been in another part of town earlier on the day of the murder and had fired a gun in a completely unrelated incident.  Defense counsel argued this throughout trial to discredit defendant's positive GSR test result.  Regardless of whether defendant's explanation was true, it is not a stretch to infer he told this to police because he is familiar with handling guns and GSR.

¶ 176   In the end, we do not find that the comments made by the State during its rebuttal closing argument, in any of the three categories defendant cites, were a material factor in his convictions nor that they substantially prejudiced him such that the outcome of trial would have been

different had the State not made them. See, *e.g.*, *Wheeler*, 226 Ill. 2d at 123.

¶ 177                                    D. Cumulative Effect

¶ 178   In his final assertion regarding prosecutorial misconduct, defendant argues that apart from the individual comments cited, their cumulative effect warrants a new trial. For the final time on this topic, we disagree. Even were we to consider any of the cited comments to have been improper, they do not, even when considered cumulatively, rise to the level of substantial prejudice requiring reversal and remand of defendant's convictions. As we have discussed, the State may properly reflect in closing argument upon the evidence and witness credibility, challenge the theory of defense, and tell jurors that they ultimately have to believe one side over the other. See *People v. Robinson*, 254 Ill. App. 3d 906, 919-20 (1993); *Reed,* 243 Ill. App. 3d at 606-07. Reading all the cited comments in the context of closing arguments as a whole, we believe this is exactly what occurred here, nothing more. Any error, if any even existed, was harmless. Moreover, the record is replete with references wherein the trial court sustained defendant's objections and instructed the jury that argument was not evidence and that they should not consider any comment not based on the evidence presented. See *Simms*, 192 Ill. 2d at 396-97. This, in conjunction with the preeminent presumption that jurors follow the trial court's instructions (see *People v. Biggs*, 294 Ill. App. 3d 1046, 1051 (1998)), further underscores our determination that no reversible error occurred here.

¶ 179                                    IV. Mittimus

¶ 180   Defendant's final contention on appeal is that, if his convictions are not reversed, then alternatively, his mittimus must be corrected to reflect only one conviction and sentence for first

degree murder, as there was only one decedent.  As the State concedes, defendant is correct.

¶ 181   Briefly, we note that our state supreme court set forth the one-act, one-crime doctrine in *People v. King*, 66 Ill. 2d 551, 566 (1977), which held that multiple convictions are improper if they are based on precisely the same physical act and, since then, our courts have made clear that a defendant may not be convicted of multiple offenses based on the same act.  See *People v. Johnson*, 237 Ill. 2d 81, 97 (2010); *People v. Crespo*, 203 Ill. 2d 335, 342-43 (2010); accord *People v. Burney*, 2011 IL App (4th) 100343, ¶ 86 (where a single act is involved, multiple convictions are improper); see also *People v. Miller*, 238 Ill. 2d 161, 165 (2010).  Most significantly with respect to the instant cause, when a murder is involved, we have declared that "[w]here but one person has been murdered, then there can be but one conviction of murder." *People v. Cardona*, 158 Ill. 2d 403, 411 (1994).  And, critically, when multiple convictions have been entered in such circumstances, only one conviction—for the most serious of the murder charges—may stand, and the convictions based on less serious charges of murder must be vacated.  See *Cardona*, 158 Ill. 2d at 411-12; accord *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 175, and *People v. Bishop*, 2014 IL App (1st) 113335, ¶ 11.

¶ 182   Defendant was initially charged with 18 different counts of first degree murder, and the State pursued eight of them at trial, for which he received convictions.  Then, at sentencing, the trial court merged four counts into four others: Count 1 merged into Count 2; Count 7 merged into Count 8; Count 10 merged into Count 11; and Count 16 merged into Count 17.  He received four 70-year prison sentences on those four counts, to run concurrently.

¶ 183   However, in this case, Chervon was the only victim.  Thus, it is clear that the several different counts against defendant were simply different theories of the same single killing.

Consequently, defendant should have been convicted and sentenced on only the most serious count of murder, which the parties agree was Count 8, as it alleged that defendant committed intentional murder, that he committed it pursuant to contract, agreement or understanding (making him eligible for extended term sentencing), and that in doing so, he personally discharged a firearm that proximately caused the victim's death (adding a mandatory firearm enhancement). Accordingly, and again with the parties in full agreement, we vacate Counts 1, 2, 7, 10, 11, 16 and 17, and direct the clerk of the circuit court to amend defendant's mittimus to reflect a single conviction and sentence for first degree murder under Count 8. See, *e.g.*, *People v. Davis*, 233 Ill. 2d 244, 263-64, 265 (2000); *People v. Morgan*, 197 Ill. 2d 404, 448 (2001); see *Simmons*, 2016 IL App (1st) 131300, ¶ 175 (directing circuit court clerk to amend mittimus to reflect single conviction for murder); see also *People v. Rivera*, 378 Ill. App. 3d 896, 900 (2008) (the appellate court has the authority to correct a mittimus without remand).

¶ 184                                   CONCLUSION

¶ 185   For all the foregoing reasons, we affirm, following our limited remands, the trial court's dismissal of defendant's *Krankel* claim. With that issue finally resolved, we additionally affirm defendant's conviction for the most serious offense of first degree murder with the added factors that he committed it pursuant to a contract, agreement or understanding and that he personally discharged a firearm that proximately caused the victim's death. Finally, we otherwise affirm defendant's sentence, and correct the mittimus as indicated.

¶ 186   This Court's jurisdiction over the instant matter is no longer retained.

¶ 187   Affirmed; mittimus corrected.